## J. N. BLACK v. THE NORTH DAKOTA STATE FAIR ASSOCIATION FOR GRAND FORKS.

### (164 N. W. 297.)

Fair association grounds — grand stand — cigar and drink privileges — license for — purchaser of license — conditions — takes his own chance on.

The purchaser of a license to sell cigars and drinks in the grand stand of a fair association, takes his own chance on the crowd and the conditions.

Opinion filed March 22, 1917. On rehearing filed September 24, 1917.

Appeal from the District Court of Grand Forks County, Honorable *Chas. M. Cooley*, J.

Affirmed.

*J. F. T. O'Connor* and *Sveinbjorn Johnson,* for appellant.

It is a well-established rule that when a contract, doubtful in meaning as to any of its terms, has been prepared by one party, it shall be construed favorably to the other party and most consistent with the right

of the case, and so as to accomplish the objects and purposes the parties had in view and so as not to impair or render nugatory the rights of either party. Wyatt v. Larmer & W. Irrig. Co. 18 Colo. 298, 36 Am. St. Rep. 280, 33 Pac. 144; Noonan v. Bradley, 9 Wall. 395, 19 L. ed. 757; Kentzler v. American Mut. Acci. Asso. 88 Wis. 589, 43 Am. St. Rep. 934, 60 N. W. 1002; Christian v. First Nat. Bank, 84 C. C. A. 53, 155 Fed. 705.

It is presumed that the promisor caused the ambiguity in a contract. Blankenship v. Decker, 34 Mont. 292, 85 Pac. 1035.

A contract should be so construed as to render it operative, reasonable, and lawful. Young v. Metcalf Land Co. 18 N. D. 441, 122 N. W. 1101; Horton v. Rohlff, 69 Neb. 95, 95 N. W. 36; 2 Page, Contr. § 1121.

In ambiguous contracts, parol evidence is admissible not to determine what the parties said, but "to understand what they wrote." Thomas v. Scutt, 127 N. Y. 141, 27 N. E. 961; Juilliard v. Chaffee, 92 N. Y. 535; Chapin v. Dobson, 78 N. Y. 74, 34 Am. Rep. 512.

If a writing is incomplete, even if the incompleteness does not appear on its face from a mere inspection of it, but appears from the attendant circumstances, the subject-matter and the purposes intended to be accomplished. Putnam v. Prouty, 24 N. D. 525, 140 N. W. 93; Comp. Laws 1913, §§ 5907, 5908; Thomas v. Scutt, 127 N. Y. 138, 27 N. E. 961.

Also where some material clause, phrase, or term in the contract is of doubtful, indefinite, or ambiguous meaning. Phœnix Pub. Co. v. Riverside Clothing Co. 54 Minn. 207, 55 N. W. 912; Cameron Mill & Elevator Co. v. Charles F. Orthwein's Sons, 56 C. C. A. 613, 120 Fed. 463; Merica v. Burget, 36 Ind. App. 453, 75 N. E. 1083; Bagley & S. Co. v. Saranac River Pulp & Paper Co. 135 N. Y. 626, 32 N. E. 132; Behrman v. Linde, 47 Hun, 530; Durant v. Henry, 33 Wash. 38, 73 Pac. 775; Thomas v. Scutt, supra; Carstens v. Earles, 26 Wash. 676, 67 Pac. 404; Gould v. Boston Excelsior Co. 91 Me. 214, 64 Am. St. Rep. 221, 39 Atl. 554; Black River Lumber Co. v. Warner, 93 Mo. 374, 6 S. W. 210; Windsor v. St. Paul, M. & M. R. Co. 37 Wash. 156, 79 Pac. 613, 3 Ann. Cas. 62; Union Special Sewing Mach. Co. v. Lockwood, 110 Ill. App. 387.

Also to complete the instrument which the parties did not intend to

embrace the entire agreement between them. Halliday v. Mulligan, 113 Ill. App. 177; Domestic Sewing Mach. Co. v. Anderson, 23 Minn. 57; Beyerstedt v. Winona Mill Co. 49 Minn. 1, 51 N. W. 619; Minnesota Mfg. Co. v. Grant City Lumber & Hardware Co. 81 Mo. App. 255; Casners' Estate Mills v. Stafford, 86 Ill. App. 469; Niles v. Sire, 46 Misc. 321, 94 N. Y. Supp. 586; Glos v. Bain, 223 Ill. 343, 79 N. E. 111; Reeves & Co. v. Bruening, 13 N. D. 163, 100 N. W. 241; Wigmore, Ev. §§ 2427ff, 2472.

In such cases it may become necessary to resort to extrinsic evidence to ascertain the meaning and intent of the parties in the light of the information thus acquired. Cunningham v. Washburn, 119 Mass. 224; Eaton v. Smith, 20 Pick. 150; Burnham v. Allen, 1 Gray, 496; Smith v. Faulkner, 12 Gray, 251.

Where the extrinsic facts concerning an ambiguity are subjects of conflicting testimony, the inferences to be drawn are questions for the jury, and not for the court. Thorne & H. Line & C. Co. v. St. Louis Expanded Metal Fire Proofing Co. 77 Mo. App. 21; Rosenthal v. Ogden, 50 Neb. 218, 69 N. W. 779; Alworth v. Gordon, 81 Minn. 445, 84 N. W. 454; First Nat. Bank v. Rothschild, 107 Ill. App. 133; Mackenzie v. Seeberger, 22 C. C. A. 83, 40 U. S. App. 188, 76 Fed. 108; J. W. Reedy Elevator & Mfg. Co. v. Mertz, 107 Mo. App. 28, 80 S. W. 684; Hix v. Edison Electric Light Co. 27 App. Div. 248, 50 N. Y. Supp. 592.

Where the parties have themselves construed and acted upon an ambiguous contract, it is binding upon them and is accepted as controlling by the courts. Such conduct is the best evidence of its meaning. Hubbard City v. Bounds, — Tex. Civ. App. —, 95 S. W. 69; 2 Page, Contr. § 1126; Geithman v. Eichler, 265 Ill. 579, 107 N. E. 180; Chicago v. Sheldon, 9 Wall. 54, 19 L. ed. 596; Indiana Natural Gas & Oil Co. v. Stewart, 45 Ind. App. 554, 90 N. E. 384; Sattler v. Hallock, 160 N. Y. 291, 46 L.R.A. 679, 73 Am. St. Rep. 693, 54 N. E. 667; Parmelee v. Hambleton, 24 Ill. 609; Pratt v. Prouty, 104 Iowa, 419, 65 Am. St. Rep. 472, 73 N. W. 1035; Haddock v. Woods, 46 Iowa, 433; Moore v. Beiseker, 77 C. C. A. 545, 147 Fed. 367.

Where the contract is ambiguous and where there is a dispute between the parties as to its meaning, evidence of the terms and nature of provisions, similar contracts between the same parties, and the practical

construction thereof, is admissible. Richards v. Millard, 56 N. Y. 574; Gray v. Gannon, 4 Hun, 57.

A contract ambiguous or indefinite in its terms is to be construed in the sense in which the promisor has reason to believe it would be interpreted by the promisee. Inman Mfg. Co. v. American Cereal Co. 133 Iowa, 71, 8 L.R.A.(N.S.) 1140, 110 N. W. 287, 12 Ann. Cas. 387; Blankenship v. Decker, 34 Mont. 292, 85 Pac. 1035.

Evidence that defendant construed the contract as plaintiff did, is admissible. Kennedy v. Lee, 147 Cal. 596, 82 Pac. 257; Off v. J. B. Inderrieden Co. 74 Ill. App. 105.

The complaint alleges, and the proof offered but rejected, tended to show, that the agreement to keep the aisles open was a part of the consideration of the contract with defendant, and the principal inducement that led to the execution of the same. First Nat. Bank v. Prior, 10 N. D. 150, 86 N. W. 362; Klemik v. Henricksen Jewelry Co. 128 Minn. 490, 151 N. W. 203; Tylee v. Illinois C. R. Co. 97 Neb. 646, 150 N. W. 1015; Dunnell's Dig. (Minn.) § 3373, note 87; Hughes, Ev. p. 240; Stephen's Dig. Ev. art. 90.

Our statute on the admissibility of such evidence embraces the common law on the subject, and goes no further, and the rule has full application only within very narrow limits. Courts are careful to avoid an application of it which will further and protect, rather than prevent, fraud and oppression. Other and collateral agreements relating to the same subject and between the same parties are admissible, and should be received and considered as throwing light upon the situation and as evidencing the intent and purpose of the parties. Comp. Laws 1913, § 5889; Putnam v. Prouty, 24 N. D. 517, 140 N. W. 93; Juilliard v. Chaffee, 92 N. Y. 534; Wigmore, Ev. §§ 2425, 2429.

The trial court ignored and failed to apply the distinction of the highest importance in the law of damages for breach of contract, between uncertainty as to whether or not damages did result from the breach, uncertainty as to the cause, and uncertainty as to amount of damages, when there is no doubt that some damage has been suffered because of the breach. Blagen v. Thompson, 23 Or. 239, 18 L.R.A. 315, 31 Pac. 647; Thayer-Moore Brokerage Co. v. Campbell, 164 Mo. App. 8, 147 S. W. 550; Comp. Laws 1913, § 7146; Needham v. Halverson, 22 N. D. 594, 135 N. W. 203.

Where the value of the benefit which the party is to derive from the performance of the contract may be certain, yet if the benefit be certain, but only uncertain in value or amount, the rule that damages to be recoverable must not be contingent or uncertain does not apply. The court will not refuse redress to a litigant because the problem of solving the amount of damages is difficult, if there is substantial evidence in the record. Blagen v. Thompson, 23 Or. 239, 18 L.R.A. 321, 31 Pac. 647; Richey v. Union Cent. L. Ins. Co. 140 Wis. 486, 122 N. W. 1030; Blagen v. Thompson, 23 Or. 239, 19 L.R.A. 315, 31 Pac. 647; Treat v. Hiles, 81 Wis. 280, 50 N. W. 896; Schumacker v. Heinemann, 99 Wis. 251, 74 N. W. 785.

There is ample in the record in this case to enable a jury to arrive at the amount of damages with no less an approximation to exact justice than in the cases of lost limbs, losses by fire, and in other like cases. Tootle v. Kent, 12 Okla. 674, 73 Pac. 310; Gilbert v. Cherry, 57 Ga. 128; Cranmer v. Kohn, 7 S. D. 247, 64 N. W. 125; World's Fair in Chicago, 1893; World's Columbian Exposition v. Pasteur-Chamberland Filter Co. 82 Ill. App. 94; Nash v. Thousand Island S. B. Co. 123 App. Div. 148, 108 N. Y. Supp. 336; San Antonio v. Royal, — Tex. —, 16 S. W. 1101.

Clearly plaintiff could and would have made profits on his sales on the two days in question, had he been permitted to carry on his business according to the contract. San Antonio v. Royal, — Tex. —, 16 S. W. 1101; Cranmer v. Kohn, 7 S. D. 247, 64 N. W. 125; Bryson v. McCone, 121 Cal. 153, 53 Pac. 637; Hayes v. Cooley, 13 N. D. 204, 100 N. W. 250; Schumaker v. Heinemann, 99 Wis. 251, 74 N. W. 785.

In such cases the court should instruct the jury that they are not to conjecture or guess, but to draw reasonable and safe conclusions from the evidence in the case as it has been developed on the trial. Treat v. Hiles, 81 Wis. 280, 50 N. W. 896; Emerson v. Pacific Coast & N. Packing Co. 96 Minn. 1, 1 L.R.A.(N.S.) 445, 113 Am. St. Rep. 603, 104 N. W. 573, 6 Ann. Cas. 973; Wakeman v. Wheeler & W. Mfg. Co. 101 N. Y. 205, 54 Am. Rep. 676, 4 N. E. 264; Wells v. National Life Asso. 53 L.R.A. 33, 39 C. C. A. 476, 99 Fed. 222.

A person under the circumstances of this case, who has sold like goods and refreshments to crowds in the open air for thirty years, and for many seasons at the same place, may be permitted to estimate what his

sales each day, under normal conditions, would be. World's Columbian Exposition v. Pasteur-Chamberland Filter Co. 82 Ill. App. 94; Wells v. National Life Asso. 53 L.R.A. 33, 39 C. C. A. 476, 99 Fed. 222; Enlow v. Hawkins, 71 Kan. 633, 81 Pac. 189; Fredonia Gas Co. v. Bailey, 77 Kan. 296, 94 Pac. 258; Brown v. Hadley, 43 Kan. 267, 23 Pac. 492.

*George A. Bangs* and *George R. Robbins,* for respondent.

If defendant, a branch of the state government, engaged in the performance of the functions of the state, or a department, or if it manages, controls, or operates a department of the state government, it is exempt from suit. A sovereign state cannot be subjected to the process of its own courts or the courts of a sister state, or, save as permitted by the Constitution, of the courts of the United States. 36 Cyc. 911; Cunningham v. Macon & B. R. Co. 109 U. S. 446, 27 L. ed. 992, 3 Sup. Ct. Rep. 292, 609; State ex rel. Mille Lacs County v. Dike, 20 Minn. 363, Gil. 314; Rice v. Austin, 19 Minn. 103, 18 Am. Rep. 330, Gil. 74; State ex rel. Thompson v. Whitcomb, 28 Minn. 50, 8 N. W. 248; Western R. Co. v. DeGraff, 27 Minn. 1, 6 N. W. 341.

So, also, a suit against a department of the state government, a board, or corporation created by the state for governmental purposes, is a suit against the state, and cannot be maintained without its consent. 36 Cyc. 919; Alabama Girls Industrial School v. Reynolds, 143 Ala. 579, 42 So. 115; Alabama Industrial School v. Addler, 144 Ala. 555, 113 Am. St. Rep. 58, 42 So. 116; Moody v. State Prison, 128 N. C. 12, 53 L.R.A. 855, 38 S. E. 131; Oklahoma Agri. & Mechanical College v. Willis, 6 Okla. 593, 40 L.R.A. 677, 52 Pac. 921; State Bkg. Board v. Oklahoma Bankers' Trust Co. — Okla. —, 151 Pac. 566; Lankford v. Platte Iron Works Co. 235 U. S. 461, 59 L. ed. 316, 35 Sup. Ct. Rep. 173; Murray v. Wilson Distilling Co. 213 U. S. 151, 53 L. ed. 742, 29 Sup. Ct. Rep. 458; Jobe v. Urquhart, 98 Ark. 525, 136 S. W. 663; State Hospital v. Robertson, 115 Va. 527, 79 S. E. 1064.

Public corporations are formed or organized for the government of a portion of the state. Comp. Laws 1913, § 4499.

The legislative assembly shall take such steps as may be necessary to promote industrial, scientific, and agricultural improvements. Comp. Laws 1913, §§ 1847 et seq.; Const. § 151.

The state fair association is a mere state agency or department cre-

ated for the purpose of carrying on the business of the state imposed upon it under the Constitution, and it is not subject to suit for acts done by it in connection with the performance of this state function. Lane v. Minnesota State Agri. Soc. 62 Minn. 175, 29 L.R.A. 708, 64 N. W. 382; Berman v. Minnesota State Agri. Soc. 93 Minn. 125, 100 N. W. 732; Berman v. Cosgrove, 95 Minn. 353, 104 N. W. 534; George v. University of Minnesota Athletic Asso. 107 Minn. 424, 120 N. W. 750; Hern v. Iowa State Agri. Soc. 91 Iowa, 97, 24 L.R.A. 655, 58 N. W. 1092; Bathe v. Decatur County Agri. Soc. 73 Iowa, 11, 5 Am. St. Rep. 651, 34 N. W. 484; Minear v. State Bd. of Agri. 259 Ill. 549, 102 N. E. 1082, Ann. Cas. 1914B, 1290; Morrison v. Fisher (Morrison v. MacLaren), 160 Wis. 621, L.R.A.1915E, 469, 152 N. W. 475; Zoeller v. State Bd. of Agri. 163 Ky. 446, 173 S. W. 1143; Melvin v. State, 121 Cal. 16, 53 Pac. 416.

"Agricultural societies are not corporations in the ordinary sense of the term, but rather agencies of the state created for the purpose of assisting in promoting our most important industry." State ex rel. Custer County Agri. Soc. & L. S. Exch. v. Robinson, 35 Neb. 401, 17 L.R.A. 383, 53 N. W. 213.

"The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." Comp. Laws 1913, §§ 5889, 5938; C. L. 1913; 2 Elliott, Contr. § 1635, p. 949; Mast v. Pearce, 58 Iowa, 579, 43 Am. St. Rep. 125, 8 N. W. 632, 12 N. W. 597; Nichols v. Wyman, 71 Iowa, 160, 32 N. W. 258; Warbasse v. Card, 74 Iowa, 306, 37 N. W. 383; Brintnall v. Briggs, 87 Iowa, 538, 54 N. W. 531; Jolliffe v. Collins, 21 Mo. 338; Lamb v. Crafts, 12 Met. 353; Groome v. Ogden City Corp. 10 Utah, 54, 37 Pac. 90; York v. Stewart, 21 Mont. 515, 43 L.R.A. 125, 55 Pac. 29.

Parol evidence is not admissible to add covenants, agreements, or warranties where the parties have accepted a written agreement or statement executed and delivered as embodying the terms of the agreement. Thompson v. Libby, 34 Minn. 374, 26 N. W. 1; American Mfg. Co. v. Klarquist, 47 Minn. 344, 50 N. W. 243; McCormick Harvesting Mach. Co. v. Thompson, 46 Minn. 15, 48 N. W. 415; Bradford v. Neill, 46 Minn. 347, 49 N. W. 193; Wheaton Roller Mill Co. v. John

T. Noye Mfg. Co. 66. Minn. 156, 68 N. W. 854; McNaughton v. Wahl, 99 Minn. 92, 116 Am. St. Rep. 389, 108 N. W. 467; Tietjen v. Snead, 3 Ariz. 195, 24 Pac. 324; DeWitt v. Berry, 134 U. S. 306, 33 L. ed. 896, 10 Sup. Ct. Rep. 536; Seitz v. Brewers' Refrigerating Mach. Co. 141 U. S. 510, 35 L. ed. 837, 12 Sup. Ct. Rep. 46; Wilson v. New United States Cattle Ranch Co. 20 C. C. A. 244, 36 U. S. App. 634, 73 Fed. 994; Sanford v. Gates, T. & Co. 21 Mont. 277, 53 Pac. 749; Gaffney Mercantile Co. v. Hopkins, 21 Mont. 13, 52 Pac. 561; Fisher v. Briscoe, 10 Mont. 130, 25 Pac. 30; Western Electric Co. v. Baerthel, 127 Iowa, 467, 103 N. W. 475; Diebold Safe & Lock Co. v. Huston, 55 Kan. 104, 28 L.R.A. 53, 39 Pac. 1035; Miller v. Municipal Electric Lighting & P. Co. 133 Mo. 205, 34 S. W. 585; McCray Refrigerator & Cold Storage Co. v. Woods, 99 Mich. 269, 41 Am. St. Rep. 599, 58 N. W. 320; Gardiner v. McDonogh, 147 Cal. 313, 81 Pac. 964; Johnson v. Oppenheim, 55 N. Y. 280; Engelhorn v. Reitlinger, 122 N. Y. 81, 9 L.R.A. 549, 25 N. E. 297; Uihlein v. Matthews, 172 N. Y. 154, 64 N. E. 792; Finnigan v. Shaw, 184 Mass. 112, 68 N. E. 35.

If plaintiff suffered any damage, there is no evidence in the record from which the same can be determined. The evidence does not disclose the cause, nature, or origin of the alleged loss of profits which is sought to be recovered here. Any attempted computation thereof would be conjectural and speculative. North Star Trading Co. v. Alaska-Yukon-Pacific Exposition, 68 Wash. 457, 123 Pac. 605; Deslandes v. Scales, 187 Ala. 25, 65 So. 393; Hedrick v. Smith, — Tex. Civ. App. —, 146 S. W. 305; Silurian Mineral Springs Co. v. Kuhn, 65 Neb. 646, 91 N. W. 508; Beck v. West & Co. 87 Ala. 213, 6 So. 70; Winston Cigarette Mach. Co. v. Wells Whitehead Tobacco Co. 141 N. C. 284, 8 L.R.A.(N.S.) 255, 53 S. E. 885; Griffin v. Colver, 16 N. Y. 489, 69 Am. Dec. 718; Atchison, T. & S. F. R. Co. v. Thomas, 70 Kan. 409, 78 Pac. 861; Smuggler-Union Min. Co. v. Kent, 47 Colo. 320, 112 Pac. 223; Lane v. Storke, 10 Cal. App. 347, 101 Pac. 937; Merritt v. Adams County Land & Invest. Co. 29 N. D. 496, 151 N. W. 11.

Robinson, J.: The plaintiff brings suit to recover $500 damages for the alleged failure of defendant to observe a written concession giving

to him exclusive grand-stand privileges during fair days in July 20–24, 1915, to sell eats, drinks, candy, etc. He appeals to this court from a directed verdict and judgment, and from an order denying a new trial. There is no claim that plaintiff did not have the usual sale privileges of the grand stand, and it appears that he had all he bargained for. But defendant claims that on two of the days of the fair, when the crowds were large and the people very hungry and thirsty, the defendant permitted the aisles to become crowded and filled with people, so that it became difficult or impossible to serve them. And so the plaintiff failed to make a large expected profit. Of course the crowd was just what the plaintiff and the fair association wanted, but it seems there was too much of a good thing. And so it is possible that plaintiff might have made more sales to a smaller crowd. However, it is folly to think of the defendant bargaining to limit sales to the fair grounds or to the grand stand, or that the defendant agreed with plaintiff to police the stand or to aid him in selling his drinks. As the trial court said: "The agreement was simply a license to do business on the grand stand, and Mr. Black was bound to take the conditions there as he found them." The case does not seem to involve any real question of law or of fact. The judgment is clearly right, and is affirmed.

BIRDZELL, J., being disqualified, did not participate.

BRUCE, Ch. J. (dissenting). This is an action for the breach of a concession for the sale of ice cream and similar articles in the grand stand at the state fair. The written concession was as follows:

Grand Forks, N. D., 7–7–15.

This agreement witnesseth, That the North Dakota State Fair Association for Grand Forks leases to J. N. Black, concessioner, space as follows: Grand-stand privilege, eats, drinks, candy, etc., to be used exclusively for eats, drinks, candy, etc., during July 20–24, for which the concessioner agrees to pay $200 on demand.

Receipt of $50 is hereby acknowledged. It is mutually agreed that the terms, conditions, and stipulations printed on the back hereof are a part of this concession contract.

On the back of the concession were provisions to the effect that the

38 N. D.—8.

representatives of the fair association should have access to the premises at all times; that the buildings, tents, and inclosures should be under the approval of the superintendent; that the prices charged should be posted, as well as the number of the concession; that such concessions should not be assignable; that the violation of the concession should be the subject of forfeiture; that the premises should be left in good repair and surrendered to the fair association without notice to quit at the expiration of the contract; that the fair association should have a lien upon the property of the concessioner for its claims.

The complaint alleged that this printed concession only contained some of the terms of the agreement, and that others were oral, and that such additional terms not included were: "That the defendant promised and agreed with this plaintiff that the aisles and passages between the groups of seats into which the grand stand is divided upstairs would be kept free and clear of obstructions and spectators so that this plaintiff and his servants could pass freely along the said aisles and passages, and among the people occupying seats, for the purpose of selling and offering for sale things to eat and drink among the occupants thereof."

The complaint then alleged that on the 22d and 24th days of July, 1915, in total disregard of his promises and agreements, the defendant caused the aisles and passages between the sections and groups of seats in the said grand stand to be filled with people, and so completely obstructed by spectators, placed there by the defendant, that it was impossible for the plaintiff or his servants to pass along or through the said aisles, and that by reason thereof the plaintiff lost profits on sales of things to eat and drink in the sum of $500.

The answer is a general denial, though defendant admits the fact of the holding of the fair, the execution of the written contract, and the attendance of large crowds.

At the close of the trial the defendant moved for a directed verdict in the following language:

"At this time, if the court please, the defendant moves the court to direct the jury to return a verdict for the defendant, the State Fair Association of Grand Forks, on the ground and for the reason that the plaintiff has failed to establish facts sufficient to constitute a cause of action in this: First, that the contract or agreement that has been

introduced in evidence showing the relations existing between the plaintiff and the defendant, and what is known as plaintiff's exhibit D, evidences a mere license condition, and discloses the fact that the plaintiff Black was a mere licensee, authorized to vend certain articles in the grand stand and the portions of the grand stand immediately connected therewith.

"Further, there is no evidence showing or tending to show any violation of the agreement or of the conditions of any agreement entered into between the plaintiff and defendant, and hence no way in which the jury could determine the issues in this case in favor of the plaintiff."

The motion was granted by the trial court and the trial judge directed the jury as follows:

"Gentlemen of the Jury: In view of the conditions arising here, I deem that it is not best to allow this case to go to the jury, that is, the plaintiff, even upon the plaintiff's own showing, has not made out a case against the defendant here; *that even if the case was allowed to go to the jury and the jury should find in favor of the plaintiff in this case,* it would be my duty *to set the verdict aside,* so in view of the condition, why it is my duty to direct the jury to find a verdict for the defendant in this case."

Later the trial court filed the following memorandum decision:

"I think that in this case the only condition shown under the terms of the agreement which has been introduced here in evidence is simply a mere license to do business in the grand stand; that is, Mr. Black's privilege to sell goods in the grand stand,—and he was to take the conditions there as he should find them; that, the fair association perhaps might not have a right to wilfully keep Mr. Black from selling goods there, but in the condition which arose from the numerous patronage of the grand stand,—the selling of tickets for the grand stand, I think that condition was assumed by Mr. Black in taking the contract from the State Fair Association. There was no contract entered into between the plaintiff and defendant to keep the aisles clear; there was no duty on the defendant to police the grand stand in such a way as to make all of the patrons of the grand stand behave in a perfectly gentlemanly way towards the venders of pop and cigars. Moreover, it does not seem to me *that the testimony is sufficient* to warrant the case to go to the jury upon the question of *whether the aisles were obstructed*

so as to prevent the *boys from selling goods* in the grand stand.    And on that question alone I think there is a failure of proof, *even from the testimony* that has been introduced on behalf of the plaintiff, moreover, the testimony with regard to the damage suffered is so indefinite and uncertain that it would be impossible for the jury to arrive at any definite, or any legal, rule of estimating the damage; that is, the damage due simply to the obstruction of the aisles, if any such obstruction took place.    The testimony, I think, shows that it was possible for the boys to get up there—it might not have have been as convenient for them as it would have been if the aisles had been kept entirely clear, but it does not show—the testimony does not show, that it was impossible for them to get up.    In fact, whatever testimony there is on that question it seems to me tends to show that it was possible, so that the motion will be granted."

The first question to be determined is whether the court erred in refusing to permit the plaintiff to prove any other terms than those set out in the printed contract, and in holding that the printed instrument was complete and unambiguous.

Did he err in denying the plaintiff's following offers of proof?

Mr. Johnson: "Plaintiff offers at this time to prove by this witness that a similar memorandum with respect to the grand-stand privilege as the one attached to the complaint already introduced in evidence and marked plaintiff's exhibit C was issued to the plaintiff and accepted by him for the same concession by the defendant in the year 1911, and during said year the question of blocking of the aisles was brought to the attention of the defendant by the plaintiff, and at that time the defendant agreed with the plaintiff that the plaintiff had the right under this contract to have free access to the aisles and the right to pass through them at all times, and at that time the defendant kept the aisles free and clear, and did not permit people to sit or stand and block said aisles in the grand stand so as to interfere with the business of the plaintiff in offering for sale, selling, and delivering refreshments to spectators in the grand stand."

Mr. Johnson: "At this time the plaintiff offers to prove through or by this witness that, during the preliminary negotiations leading up to the signing, execution, and delivery of the contract marked exhibit C, the plaintiff and defendant used the term 'grand-stand privilege'

incorporated in said exhibit, understanding that the same was to include and embrace the right of the plaintiff to unobstructed passage through the aisles in the grand stand, and that the said expression, 'grand-stand privilege,' did not contemplate the right of the defendant to fill the aisles with spectators so as to render passage through them impossible by the plaintiff or by plaintiff's servants."

Mr. Johnson: "At this time the plaintiff offers to prove by this witness that plaintiff's exhibit C is, in all its terms with respect to the grand-stand privilege, identical with the contract entered into between plaintiff and defendant in 1911, pertaining to the privilege of maintaining and conducting a refreshment stand during the state fair under the management of the defendant in that year; that the contract of 1911, relating to the grand-stand privilege, was interpreted by the plaintiff and by defendant to entitle plaintiff to demand and require of the defendant that the aisles in the grand stand be kept clear and free of spectators sitting therein, so that plaintiff's servants could at all times pass along said aisles to offer for sale and sell and deliver refreshments to spectators in the grand stand. That in the said year 1911 when, for the first time, spectators began to occupy the aisles as seats, plaintiff demanded of defendant and of the superintendent of concessions (the witness) that the aisles be not filled and obstructed by spectators, that the defendant and the witness acquiesced in said demand, and that the defendant did not sell tickets to more people than could be seated in the seats without seating spectators in the aisles; that thereupon the superintendent of concessions removed such spectators as had begun to obstruct the aisles, and directed that no more tickets be sold than would be sufficient to fill the seats in the grand stand; that these acts were done by the said superintendent of concessions, pursuant to a demand from the plaintiff, for the reason that the superintendent of concessions so construed the contract between plaintiff and defendant as to entitle plaintiff to free and unobstructed passage through the aisles.

"Plaintiff also, in connection with this offer of proof, offers in evidence exhibit D."

I think it erred. The contract was surely not complete on its face. It provided for a grand- stand privilege. What was that grand-stand privilege? It is conceded by counsel for the defendant that this grand-

stand privilege extended not merely to the grand stand, but to the bleachers. It is conceded that it applied not merely to a place or booth beneath the grand stand, but to the seats above. On its face it merely used the terms, "space as follows: Grand-stand privilege—eats, drinks, candy, etc., to be used exclusively for eats, drinks, candy, etc., during July 20–24."

Surely parol evidence was competent to show what that grand-stand privilege was. How comprehensive! Whether it included the bleachers as well as the grand stand proper, whether it implied the free access of the servants of the concessioner to the grand stand and bleachers, or whether it did not. If it included their free access, did it include the right to have the passage and alleyways unobstructed so that sales could readily be made? The evidence was admissible not to vary the terms of the instrument, but to show what they meant. Thomas v. Scutt, 127 N. Y. 141, 27 N. E. 961. The contract was not complete in itself, and the circumstances were such as to indicate its incompleteness, and in such a case, parol evidence is admissible. Putnam v. Prouty, 24 N. D. 525, 140 N. W. 93; Phoenix Pub. Co. v. Riverside Clothing Co. 54 Minn. 207, 55 N. W. 912; Polebitzke v. John Week Lumber Co. 163 Wis. 322, 158 N. W. 62.

Nor was the attempt to prove the right to the access to the aisles one to add a warranty to the contract. It was rather to show what that contract included, and whether a grand stand with unobstructed aisles had been contracted for or one that was obstructed. Even if a warranty, there was evidence to show, or the plaintiff at any rate was entitled to show, that the written instrument was nothing more than a receipt and that the real contract was oral.

But defendant contends that the damages sought to be recovered are purely speculative. He cites the well-known rule laid down in the case of Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Reprint, 145, 2 C. L. R. 517, 23 L. J. Exch. N. S. 179, 18 Jur. 358, 2 Week. Rep. 302, 5 Eng. Rul. Cas. 502, and enacted in this state in § 7146, Comp. Laws 1913, see Needham v. Halverson, 22 N. D. 594, 135 N. W. 203, that damages for the breach of a contract must have been contemplated by the parties or have been so likely to follow that they would have been anticipated if the matter had been considered. He argues that no separate books of account were kept of the receipts of

the grand stand and of the bleechers.   He also argues that the cost of production was not definitely shown.   He quotes from 13 Cyc. 36, where it is said: "In order to recover profits in case of a breach of contract, such profits must have been within the contemplation of the parties, at the time that the contract was made. . . .  In all cases the damages claimed should be capable of being definitely ascertained. Where the damages claimed are so speculative and dependent upon numerous and changing contingencies that their amount is not sus-ceptible of actual proof, with any reasonable degree of certainty, no recovery can be had."

It is undoubtedly the rule that the damages must be certain, both in their nature and in respect to the cause from which they proceed. 8 R. C. L. 438.   It is now generally held, however, that this certainty must be as to the fact and cause of the damage, rather than as to the amount, and that, where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery. 8 R. C. L. 442.   In the case at bar two methods of arriving at the damages were applicable and could have been resorted to.   One, the difference between the value of the license or concession with and without the free and unobstructed use of the passageways or aisles; and one, the loss of profits caused by the obstruction of the aisles.   What this difference in value was, was a matter principally for the jury to determine; and though the evidence was more or less indefinite, I yet believe that it was not entirely inadequate.   The plaintiff, it is true, did not testify as to the actual cost of production, except as to the pop, but he did testify as to his usual percentage of profit.   It is true that the number of sales that would have been made was not, and could not be, accurately shown, but he did show the attendance on the days when the aisles were and were not obstructed, and the receipts for these days, and the atmospherical conditions prevailing during this time.   From this evidence we believe the jury could estimate either the difference in value of the concession or what is practically the same thing, the loss of profits.

The rule is laid down by the superior court of New York in the case of Wakeman v. Wheeler & W. Mfg. Co. 101 N. Y. 205, 54 Am. Rep. 676–678, 4 N. E. 264, where the court says: "It is frequently difficult to apply the rules of damages and to determine how far and

when opinion evidence may be received to prove the amount of damages; and the difficulty is encountered in a marked degree in this case. One who violates his contract with another is liable for all the direct and proximate damages which result from the violation. The damages must be not merely speculative, possible and imaginary, but they must be reasonably certain, and such only as actually follow or may follow from the breach of the contract. They may be so remote as not to be directly traceable to the breach, or they may be the result of other intervening causes, and then they cannot be allowed. They are nearly always involved in some uncertainty and contingency; usually they are to be worked out in the future, and they can be determined only approximately upon reasonable conjectures and probable estimates. They may be so uncertain, contingent, and imaginary as to be incapable of adequate proof, and then they cannot be recovered because they cannot be proved. But when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain. It is not true that loss of profits cannot be allowed as damages for a breach of contract. Losses sustained and gains prevented are proper elements of damage. Most contracts are entered into with the view to future profits, and such profits are in the contemplation of the parties, and so far as they can be properly proved, they may form the measure of damage. As they are prospective they must, to some extent, be uncertain and problematical, and yet on that account a person complaining of breach of contract is not to be deprived of all remedy. It is usually his right to prove the nature of his contract, the circumstances surrounding and following its breach, and the consequences naturally and plainly traceable to it; and then it is for the jury, under proper instructions as to the rules of damages, to determine the compensation to be awarded for the breach. When a contract is repudiated the compensation of the party complaining of its repudiation should be the value of the contract. He has been deprived of his contract, and he should have in lieu thereof its value, to be ascertained by the applica-

tion of rules of law which have been laid down for the guidance of the courts and jurors."

But was the fair association suable at all? The defendant contends that the North Dakota Fair Association is a private corporation created to perform governmental functions and to act as an agent for the state, and that as such it is not subject to suit. "The fair association," he says, "is a corporation, it is true, but it has no property and can acquire none. It does not own the land purchased by it nor the buildings thereon, but this property is conveyed to and owned by the state. If a judgment were rendered against the defendant it could not be satisfied, for the defendant owns no property. It could not be seriously urged that the gate receipts of a fair carried on by the state could be levied upon for the debt of the association."

The defendant was incorporated under § 1847 of the Compiled Laws of 1913. This section provides that: "For the purpose of promoting and improving the condition of agriculture, etc., a state fair or exposition shall be held biennially at or near the city of Grand Forks, . . . during each odd-numbered year, and biennially at or near the city of Fargo, . . . during each even-numbered year."

Section 1848 provides that: "If an organization, to be known and designated as the North Dakota State Fair Association for Grand Forks, or by some similar name, shall be, during the year 1905, created and organized under and pursuant to the general laws of this state, in relation to corporations, with a paid-up capital stock of not less than $20,000, such association shall become entitled to receive the appropriations hereinafter named upon the conditions set forth in this article. The said association may acquire the title to not less than 70 nor more than 160 acres of ground at or near the city of Grand Forks, in said state, and such association may, and it is hereby empowered and authorized to convey the title to the land so acquired by it, unto the state of North Dakota, which property, when so conveyed, shall be held by the state of North Dakota forever for the following purposes and no other: For the purpose of exhibiting thereon under the management of such association, or its successors, biennially, during each odd-numbered year the agricultural, stock breeding, horticultural, mining, mechanical, industrial and other products and resources of the state of North Dakota, including proper exhibits of the arts, sciences and all other public dis-

plays pertinent to and dependent upon exhibitions and expositions of human art, industry and skill.  The said association may use so much of its paid-up capital stock as may be necessary for the acquisition of title to the land so to be purchased by it for use as fair grounds, and the balance thereof shall be and constitute a fund toward the construction of buildings and other permanant improvements thereon."

Section 1849 is similar to § 1848, save that it relates to Fargo rather than Grand Forks.

Section 1850 provides that: "The custody and control of the premises upon which said fair at Grand Forks is located shall be vested in said North Dakota state fair association for Grand Forks, and the general offices thereof shall be located and maintained either upon the premises so acquired or at some suitable place in the city of Grand Forks, and said association is hereby authorized, required and empowered to maintain its said offices as aforesaid wherein shall be contained the property and records of such association, and the entire care, custody, management and control of said premises, and the structures thereon, shall be vested in said association."

Section 1851 is the same as § 1850, except that it relates to Fargo rather than to Grand Forks.

Section 1852 is as follows: "When the state of North Dakota accepts the title to the land so acquired by either of said associations, which acceptance shall be made by the governor and attorney-general, thereupon, and not before such time, shall the deed of conveyance of said property to the state be accepted and recorded.  Should the state of North Dakota cease to appropriate the sum of at least $5,000 annually to be awarded as premiums in connection with said fairs then the title of said premises shall revert to and become the property of the association that transferred the same to the state; provided, further, that the state shall never become liable for any of the debts and liabilities of said associations, save as appropriations shall be made therefor from time to time by the legislative assembly.  The provisions of this article shall not become binding upon the state as to either fair association until the stockholders of such association shall adopt and file with the secretary of state an irrepealable by-law consenting and providing that its board of directors shall consist of fifteen persons; that the governor, commissioner of agriculture and labor and the state auditor

shall *ex officio,* constitute three of such directors; that five of the directors of such association shall be residents of the judicial district in which said fair is to be held, and that one director shall be selected from each other judicial district of this state, and shall be a resident of the same."

Section 1853 is as follows: "The board of directors of each association shall appoint an executive committee which shall keep an accurate account of the expenditures of all moneys appropriated to it by the state and of all other receipts and expenditures, and shall collect, arrange and collate all the information in their power in relation to the nature and preparation of soils, the cultivation and growth of crops, the breeding and management of stock, the application and character of manure and fertilizers, the introduction of new cereals and other grains and other agricultural subjects, and reports the same together with a statement of their doings, and such account of their expenditures, to the governor on or prior to the 1st day of January each year following the holding of a fair, such report to be audited by the governor, Commissioner of Agriculture and Labor and the auditor, and by the governor laid before the legislative assembly. All moneys hereby appropriated shall be paid over to the treasurer of the association entitled to the same on the order of the president attested by the secretary."

Section 1854 is as follows: "It shall be the duty of the directors of any fair association to require the treasurer thereof to give a sufficient bond to such directors, conditioned for the faithful keeping of such money as may come into his hands as such treasurer."

Section 1856 is as follows: "For the purpose of enabling said association to suitably inclose their grounds and to aid them in the erection thereon of proper buildings, structures and other improvements suitable for the purposes of giving expositions or fairs the sum of $10,000 is hereby appropriated out of the moneys in the state treasury, not otherwise appropriated, one half of which amount shall go to each association; provided, nevertheless, that no part of said appropriation shall be payable until after a deed of conveyance of the premises upon which the fair is to be held, has been made and accepted by the state as hereinbefore provided; provided, further, that this appropriation

shall lapse and shall only be available to the association whose conveyance is made and accepted by the state on or prior to June 1, 1906."

Section 1857 is as follows: "There is hereby appropriated out of any funds in the treasury of the state of North Dakota not otherwise appropriated, the sum of $10,000 for premiums and $5,000 for maintenance, annually, to be expended by the directors of said association as follows:

"For premiums in the way of live stock, poultry and agricultural products for better farming interests. Such appropriation to be paid to the North Dakota Fair Association for Grand Forks in the odd-numbered years, and to the North Dakota Fair Association for Fargo in the even-numbered years."

Section 1858 is as follows: "The provisions of this article shall not become binding or effective upon the state as to either of such associations until the stockholders of such association shall adopt a by-law expressly accepting and agreeing to all of the conditions hereof, and file a certified copy of said by-law with the secretary of state."

Section 1859 is as follows: "In the event of the failure of either of such associations to comply with the provisions of this article then the other association shall be entitled to hold a state fair upon its grounds during each year and receive the appropriation herein made for the association failing thus to comply with this article, and such failure on the part of either association shall operate to permanently establish the state fair upon the grounds of the other association; provided, that nothing in this article contained shall be construed to prohibit the fair association leasing said grounds and buildings for the purpose of holding stock and agricultural exhibits when they deem it advisable."

It can hardly be held, after a perusal of these statutes, that the fair association is entirely and exclusively a public institution. It is true that it is the recipient of state funds and that such state funds must be used for premiums. The land, it is true, is deeded to the state, but the deed becomes inoperative as soon as the allowance for premiums is discontinued. It is true that among its directors must, *ex officio,* be certain of the state officers. But there is nothing to show that these state officers act in any other capacity or have greater powers than ordinary directors.

Outside of its legitimate and educational features of stock and agricultural displays and contests, it grants concessions to fortune tellers, vaudeville artists, and all manner of ring throwing and other semi-gambling device promoters. It harbors mountebanks. It conducts automobile and motorcycle races. Its purpose is to attract crowds as much as it is to promote agriculture. The state has no control over these matters or over the revenues derived therefrom. The sum appropriated by the state is no doubt a trust fund and can no doubt neither be levied upon nor used for any purpose but the furnishing of agricultural premiums, but over the other funds the state has no control. The real estate, no doubt, may not be levied upon as long as the state furnishes money for premiums, and, perhaps, as suggested by counsel, the association makes no profits, but its stock is privately subscribed and it nonetheless conducts a private as well as a public enterprise, and as such is liable to private suit.

I find, indeed, in the adjudicated cases no little authority for this position, and, if we carefully examine the statutes of the several states, practically none are against it. Among these is the case of Tongue v. State Bd. of Agri. 55 Or. 61, 105 Pac. 250, the syllabus of which is as follows: "Laws 1899, p. 208 (B. & C. Comp. §§ 4135–4147), provides that five citizens of the state, to be named by the governor, shall constitute a board of agriculture which shall be charged with the exclusive management of the state agricultural society, have the direction of its entire business affairs, and be authorized to purchase and hold real estate. The board is required to provide for an annual fair, and in no event is the state to be liable for any premium awarded or debt, created beyond the amount annually appropriated therefor. The act also provides for an annual appropriation from the state treasury to aid in carrying on the purposes of the board; no part of such allowance to be paid as a premium for trials of speed. Held, that the board is a 'corporation,' and not a branch of the state government, nor for the administration of state affairs; it not being accountable to the state for money received by it, except the legislative appropriation, and it having the power to make contracts, and, as a necessary incident thereto, the right to appeal to the courts for the enforcement of them, it may be sued for a like purpose."

See also Lane v. Minnesota State Agri. Soc. 62 Minn. 175, 29

L.R.A.708, 64 N. W. 382; Downing v. Indiana State Bd. of Agri.
129 Ind. 443, 12 L.R.A. 664, 28 N. E. 123, 614; Dunn v. Brown
County Agri. Soc. 46 Ohio St. 93, 1 L.R.A. 754, 15 Am. St. Rep.
556, 18 N. E. 496; Yarmouth v. North Yarmouth, 34 Me. 411, 56
Am. Dec. 666; University of Maryland v. Williams, 9 Gill & J. 365,
31 Am. Dec. 72; 1 R. C. L. 784.

I have carefully examined the cases cited by counsel for respondent,
but none of them appear to be applicable to the case which is before us.
In Minnesota and California, for instance, the fair associations under
consideration were made public corporations by express statute. See
Minn. Gen. Stat. 1913, § 6491; Cal. Stat. 1880, p. 49; Melvin v. State,
121 Cal. 16, 53 Pac. 416.

In the cases of Bathe v. Decatur County Agri. Soc. 73 Iowa, 11, 5
Am. St. Rep. 651, 34 N. W. 484, and Hern v. Iowa State Agri. Soc.
91 Iowa, 97, 24 L.R.A. 655, 58 N. W. 1092, the associations were held
not to have been organized for profit, to have had no stockholders,
their powers to have been expressly limited by the statute, and the
acts complained of to have been *ultra vires*.

In the cases of Zoeller v. State Bd. of Agri. 163 Ky. 446, 173 S.
W. 1143, and Morrison v. Fisher (Morrison v. MacLaren) 160 Wis.
621, L.R.A.1915E, 469, 152 N. W. 475; and Minear v. State Bd. of
Agri. 259 Ill. 549, 102 N. E. 1082, Ann. Cas. 1914B, 1290, not only
were the fairs controlled by state boards of agriculture, but the actions
were tort actions for personal injuries. In all of them it seems to have
been conceded that the association or board could sue and be sued on
its contracts, and it was only tort liability that was considered. None
of the cases, in fact, which are cited by counsel for respondent, are
contract cases.

I am also of the opinion that there was at least some evidence tend-
ing to prove that the aisles had been obstructed.

In my opinion the judgment of the district court should be reversed
and a new trial be ordered.

CHRISTIANSON, J. (concurring specially) : I concur in an affirmance
of the judgment. I shall not attempt to state the facts at length, or
discuss all the legal questions involved and referred to in the dissenting
opinion, prepared by Mr. Chief Justice Bruce.

The plaintiff seeks to recover damages for the violation of a certain stipulation, not contained in the written agreement involved in the case. Plaintiff claims that the writing does not constitute the entire agreement, but that an oral stipulation was entered into under which "the defendant promised and agreed with the plaintiff that the isles and passages between the groups of seats into which the grand stand is divided would be kept free and clear of obstructions and spectators so that the plaintiff and his servants could pass freely among said aisles and passages and among the people occupying seats, for the purpose of selling and offering for sale things to eat and drink, among the occupants thereof." Plaintiff made certain offers of proof with respect to such alleged oral stipulation, which offers were rejected. These offers of proof are set forth in the dissenting opinion for Mr. Chief Justice Bruce, to which I refer. It will be noted that two of the offers of proof relate to the construction placed upon an agreement made in 1911 between the plaintiff and the then superintendent of concessions of the defendant. The written agreement made in 1911 was offered in evidence as part of the offer of proof, and an examination of this agreement discloses that it is wholly different from the writing involved in the case at bar. The term, "grand-stand privilege," is nowhere found in the 1911 agreement. The 1911 agreement recites "that the party of the first part has leased and let unto the party of the second part the following privilege only, to wit: The exclusive privilege to operate a refreshment stand and to sell refreshments in the grand stand and bleachers. Said privilege so leased and let, to be conducted upon the premises described as follows: In the southeast corner of the grand-stand."

While the contemporaneous construction placed by the contracting parties on an ambiguous agreement tends to show what the parties intended by the ambiguous terms, and is persuasive evidence of the intent of the parties, it seems obvious that the construction placed by parties upon a different agreement couched in wholly different language would furnish no evidence of such intent. I do not, however, intend to devote any more time or space to this feature of the case, but will, for the purposes of this opinion, assume that the agreement was as alleged in the complaint (although Moore, the secretary of the de-

fendant, on cross-examination specifically denied any such agreement or understanding).

The evidence shows that the fair was conducted for five days: July 20th, 21st, 22d, 23d and 24th. The evidence also shows that the plaintiff maintained a refreshment stand under the grand stand; that, in addition to the sales there made, he engaged certain boys to make sales in the grand stand and bleachers, and a so-called paddock or lobby. These boys received for their services 20 per cent of their sales. In answer to the question, "How many men did you have working the grandstand?" the plaintiff answered, "Different amounts, different times." He thereupon testified that he had thirteen boys on July 21st, twelve boys on July 22d, and ten boys on July 24th. He states that he does not know how many he had on July 23d, nor does he venture any statement as to how many he had on July 20th. The two days on which plaintiff claims the aisles were blocked and for which damages are sought were July 22d and 24th. It therefore appears that on these two days he had fewer boys working than on the other days. It also appears that on the afternoon of July 24th, when it is claimed the principal injury was sustained, certain automobile races were being held. Two of the boys engaged in making sales were called as witnesses for the plaintiff, and they both testified that the people were tremendously interested in the races; that the crowd objected not only when the boys were in the aisles, but also when they were endeavoring to pass between the rows of seats. Of course, this was the only way in which they could pass, and these complaints would have existed even though the aisles had not been blocked. The witnesses also admit that they were, themselves, greatly interested in the races, which it appears were the first automobile races ever held on these fair grounds. It also appears that on July 22d certain horse races were held, and that these races aroused a great deal of interest, and in a measure duplicated the condition which existed at the time of the automobile races on July 24th.

The only evidence furnished by plaintiff as a basis for assessment of damages was a statement of the total amount of cash received by him, and the number of admissions to the grounds and grand stand on each of the different days. The cash received by plaintiff included the moneys received at the stand and by the different venders who sold

refreshments in the grand stand, bleachers, and paddock. Plaintiff admits that he has no knowledge and can furnish no evidence of the cash received from sales made in the grand stand on the different days.

I have no quarrel with the legal proposition advanced by the appellant and sustained by the opinion of the chief justice, that "where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery." 8 R. C. L. p. 442. It is true, the rule as against the recovery of uncertain damages has been generally directed as against uncertainty of cause, rather than uncertainty as to measure or extent. This does not, however, mean that in case of breach of contract a party, by merely showing a breach, will be entitled to have a jury speculate upon the amount of damages. It is still true that "the damages recoverable in any case must be susceptible of ascertainment with a reasonable degree of certainty, or, as the rule is sometimes stated, must be certain both in their nature and in respect to the cause from which they proceed. Therefore uncertain, contingent, or speculative damages cannot be recovered either in actions *ex contractu,* or in actions *ex delicto.* Several reasons are assigned, one of which is that uncertain or speculative damages are not susceptible of the exactness of proof that is required to fix a liability." 8 R. C. L. p. 438. The party injured by the breach of a contract is entitled to a just and adequate compensation for the injury, and no more; and where he asks to recover profits, he must show that the profits which he claims to have been deprived of were reasonably certain and probable, and that he lost them on account of the breach of the contract.

It is therefore a general rule that "where an established business is wrongfully injured, destroyed, or interrupted, the owner of such business can recover damages sustained, but in all such cases it must be made to appear that the business which is claimed to have been interrupted was an established one; that it had been successfully conducted for such a length of time and had such a trade established that the profits thereof are reasonably ascertainable." 13 Cyc. 59. But that, "where a new business or enterprise is floated, and damages by way of profit are claimed for its interruption or prevention, they will be denied for the reason that such business is an adventure, as distinguished from an established business, and its profits are speculative and remote, existing only in anticipation." Ibid.

While profits are allowed when they form a consistent element of the contract and the amount can be estimated with reasonable certainty from established data, profits which are speculative, conjectural, or contingent and which cannot be measured by the rules of evidence to a reasonable degree of certainty, or which are not the natural, direct, and certain result of the breach, are not recoverable as damages in actions for breach of contract. A party asserting injury is not entitled to damages for any fancied or probable advantage he might have derived from his contract, and the jury cannot be permitted to speculate whether damages have or have not been occasioned. A party claiming damages by reason of a breach of contract must show not only the breach, but further prove that by reason of the breach, he has sustained injury, and he must furnish data from which the amount of such injury can be estimated with reasonable certainty.

It seems to me that the plaintiff in this case has wholly failed to sustain this burden, and has proved rather than the decrease in his sales was occasioned by causes other than the alleged breach of contract.

While there is evidence tending to show that people were sitting in the aisles, the evidence also shows that some sales were made in the grand stand, and that so far as the first four or five rows were concerned the alleged blocking of the aisles did not interfere with the sales. Although the evidence tends to show the alleged blocking made passage more difficult, I do not believe that the evidence shows that this necessarily prevented the salesmen from passing among the persons sitting in the grand stand.

The testimony of the salesmen called as witnesses by the plaintiff show that the people resented any interference with their view of the races. This resentment was expressed not only when the salesmen were attempting to get through the aisles, but when they were passing between the rows of seats, and when they were passing their wares among those seated in the first rows. If the evidence shows any predominant cause for the decrease of sales, it was the interest taken by the spectators in the races and their expressed desire to be permitted to observe them without interruption by reason of venders of refreshments passing back and forth in front of them.

The conceded interest taken in the races by the audience as well as

by the salesmen; the difference in number and personnel of salesmen; the total failure and conceded inability to show the cash received from the sales in the grand stand on the different days,—all inject elements of uncertainty. Taking the record as a whole I am unable to find any evidence upon which any person could base an intelligent guess whether, or to what extent, plaintiff was injured by reason of the alleged breach of contract. In my opinion there is no data upon which an intelligent estimate as to injury or its extent could be based. And, taking the evidence as a whole, it seems inconceivable that any evidence could be adduced upon a new trial upon the question of damages, which would warrant any jury in awarding more than nominal damages,

## On Rehearing.

ROBINSON, J. (after rehearing had). In this case the petition for rehearing is not based on the decision as a whole, nor on any matter overlooked in the decision. It is based on eight points covered by eight separate sentences of the decision, and unfortunately it is true that the reasoning of the case is not all expressed in one sentence. As the decision shows, the plaintiff bargained for the exclusive grand-stand privileges during the fair week to sell eats, drinks, candy, and such like to the patrons of the fair on the grand stand inclosure. We say the plaintiff had such privileges, and he had all he bargained for, and there is no claim that he did not have the usual and exclusive sale privileges of the grand stand. His license was on printed form which had been prepared for general use by the directors and managers of the fair association. He bought it from a salesman or special agent of the fair association. His claim is that he had a special oral contract with the special agent that the fair association should keep open the aisles of the grand stand so as to give him ready access to the people for the purpose of selling his eats and drinks—and this they failed to do—and his offer of proof to that effect was rejected. He made no offer to prove that the directors had given the special agent any authority to make such a special contract. The obvious and unusual purpose of the grand stand is to make money by seating patrons on the stand, both on the seats, and when necessary in the aisles. This obvious

right and purpose the holder of special privileges had no right to limit or vary. The judgment is clearly right, and it is affirmed.

GRACE, J. I concur in the result.

BIRDZELL, J., being disqualified, did not participate.