# NEEDHAM v. HALVERSON.

(135 N. W. 203.)

**Sale of horse — breach of warranty — measure of damages.**

1. In an action on the contract to recover for the breach of a warranty in a sale of glandered horses, with knowledge that such horses are to be mingled with others, damages may be recovered both for the loss of the horses originally sold and purchased and of others with which they have been mingled, and to which they have communicated the disease, and also for the reasonable expense of caring for such animals, of buying the same, and of fumigating and disinfecting the premises.

**Sale of diseased horse — action of tort for damages.**

2. Similar damages may also be recovered in an action of tort which is based upon the theory of a false and fraudulent sale and warranty with knowledge of the existence of the disease, and are deemed proximate.

**Sale of diseased horse — breach of warranty — measure of damages.**

3. Such damages may include compensation for the hire of men and the value of the use of the time of the farmer or purchaser in caring for and burying such horses and in disinfecting his premises, and the reasonable cost of medicines and drugs and veterinary attendance. They will not, however, include damages for the loss of the use of the teams which it is claimed might otherwise have been used by the men so employed in caring for the animals or for possible breaking and plowing which might possibly have been done by such farmer if he had not been so employed in caring for his horses, nor for the loss of crops which might have been grown upon land which he might have plowed and seeded if not so occupied. Such damages are neither proximate so as to be recoverable in a tort action, nor can they be deemed to have been within the contemplation of parties at the time of the making of the contract, so as to be recoverable in an action for the breach of the warranty.

**Evidence — admissions by agent.**

4. Where evidence tended to show that horses were sold, warranted to be free from glanders, and the vendor retained a chattel mortgage on the same, *held*, that the admission of an agent of the vendor, who was sent out to prevent the destruction of said horses by the state veterinarian, that prior to the sale

Note.—The measure of damages recoverable for selling diseased animals is considered, with a full review of the authorities, in a note in 34 L.R.A.(N.S.) 697. And the liability of the vender of diseased live stock, in the absence of an express warranty, is the subject of a note in 29 L.R.A.(N.S.) 202.

As to what amounts to a breach of warranty of soundness of a horse, see notes in 32 L.R.A.(N.S.) 182, and 53 Am. Dec. 177.

the said horses were infected and he knew that fact, was admissible against the vendor in an action for breach of warranty and for fraudulent representations as to the freedom of the horses from the disease of glanders.

Opinion filed February 15, 1912.

Appeal from the District Court of Barnes county; *Burke, J.*

Action for damages caused by the sale of glandered horses. Verdict and judgment for the plaintiff. Defendant appeals.

Affirmed on condition.

This is an action to recover damages occasioned by the sale of glandered horses. In the complaint two causes of action are joined, one in contract for breach of a warranty that the said horses were free from disease, and one in tort for a false and fraudulent warranty and statements of facts in relation to glanders, and a sale as a result thereof. Verdict and judgment were rendered for the plaintiff in the sum of $1,043.90, and defendant appeals.

*L. N. Miller* and *V. R. Lovell,* for appellant.

*Lee Combs,* for respondent.

BRUCE, J. (after stating the facts as above). Defendant contends that the trial court erred both in refusing to compel plaintiff to elect under which of said causes of action he would proceed, and in not refusing to admit any evidence under the complaint on account of the alleged misjoinder of causes of action. There was no misjoinder, and the court did not err. "In the sale of a horse," says Mr. Phillips on page 184 of his work on Code Pleading, "the vendor may make both a false warranty and a false representation, and thus become liable to the vendee for the deceit and for the breach of warranty; and the vendee would, correspondingly, have two grounds of recovery, but would be entitled to only one relief in damages. The vendee in such a case can maintain an action based upon either right of action alone, or, since both rights of action arise out of the same transaction, he may base his action upon both grounds, stating them in separate causes of action. One of these two rights of action would arise from tort, the other from contract." See also 1 Pom. Remedies, 467; Humphrey v. Merriam, 37 Minn. 502, 35 N. W. 365; Robinson v. Flint, 7 Abb. Pr. 393, note; Murphy v. McGraw, 74 Mich. 318, 41 N. W. 917; Freer

v. Denton, 61 N. Y. 492. These authorities seem to be conclusive upon the proposition.

The remaining questions for us to consider are the admissibility of the admissions of the witness Alfred Jackson, and the question of the measure of damages in the case, and the admission of evidence in regard to value.

Provided that both tort and contract causes of action were properly joined in the complaint, which we hold to be the fact, and provided that sufficient evidence was adduced upon the trial, both the tort and the contract measure of damages could be made to apply in this case. Under the facts of the case, and since the witness H. S. Halverson, the secretary and treasurer and manager of the defendant company, testified on the trial that when he sold the horses he knew that "Needham was a farmer, and knew he had horses out there on his farm. I thought he would take these horses out there and work them, and knew he would mingle these horses with his. I supposed he would do this before I sold him the horses,"—there would be but little difference in the measure of damages under each cause of action. The measure of damages in tort, as given by § 6582 of the Code, is "the amount which will compensate for all the detriment proximately caused by the wrongful act, whether it could have been anticipated or not," and this is merely a restatement of the common-law rule. The measure of damages for breach of contract, as expressed in § 6563 of the Revised Codes of 1905, is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin," and this section has been held to practically restate the common-law rule early laid down in the case of Hadley v. Baxendale, that the measure of damages in contract are those damages which were actually anticipated by the parties entering into the contract, or which are so probable and natural that they would have been reasonably anticipated by one entering into the relationship, if he had thought upon the subject. There can be no doubt that under the case of Larson v. Calder, 16 N. D. 248, 113 N. W. 103, the jury were justified in finding that a warranty was made in the premises, and that the horses, when sold, were afflicted with glan-

ders, and we believe that the jury were justified in finding such a fact even independently of the admissions of the witness Jackson, to which we will later refer. We cannot help but feel, however, that the admissions of the witness Jackson went far to produce this impression in the minds of the jury, and that if these admissions were inadmissible, the judgment should be reversed. We, however, do not believe that the appellant is correct in his contention that in this case the only measure of damages is that prescribed by § 6595 of the Revised Codes of 1905, which provides that "in estimating damages . . . the value of property to a buyer or owner thereof deprived of its possession is deemed to be the price at which he might have bought an equivalent thing in the market nearest to the place where the property ought to have been put into his possession, and at such time after the breach of duty upon which his right to damages is founded as would suffice, with reasonable diligence, for him to make such a purchase." This is the measure by which to determine the value of the property of which the plaintiff is deprived. This statute applies to a case where the seller refuses to convey, and not to a case where a delivery is made and damages result from a breach of warranty of fitness, and the injury occasioned is not merely the loss of the goods sold, but the spread of a contagious disease and injury resultant therefrom.

In considering the admissibility of the admissions complained of, we have to consider the questions: 1st. Who was the witness Alfred Jackson, and what relationship did he bear to the defendant corporation? 2d. What was the nature of his admissions? and, 3d. when and where they were made? Who the witness Jackson was, and his relationship to the corporation, may be gathered from the testimony of the witness Halverson. Halverson testified that he himself was the secretary, treasurer, and manager of the defendant company, and that Jackson was working for him. "He (Jackson) had been working for the corporation and was working at the time that Needham got the horses. When I am away he has charge of the barn and the procuring and making sales of horses, and had been, on behalf of the defendant company." Alfred Jackson testified: "I handled and bought and sold horses and cattle for that company. I know where Halverson & Company got that team. I bought one about 20 miles north of McHenry, and the other I bought from a man by the name of Wentworth. . . .

I went out to prevent that one horse being killed. I had received information that it had been condemned by the state veterinarian for glanders, and I went out there to insist upon an examination before it was shot. . . . When I bought those gray horses from that man up north, one of them was running at the nose a little. That was about a month before I sold them to Mr. Needham. I don't know whether that running of pus from the nostrils of that horse continued all the time up to the time I sold them to Needham. . . . I did not deliver the horses to Needham. John Hanson led the horses out and handed them to Needham. I don't know if he got anything from me. I may have told him I would give him a bottle of medicine for the cold the horses had. . . . I have been with Halverson & Company three years, and have bought and sold a few horses during that time. They had a barn of fifty horses when this sale was made. Mr. Halverson sold most of the horses. Probably a hundred a year was sold out of the business there. I can't say how many horses I have handled there. . . . Beside acting for this corporation as purchaser and salesman, I also took charge of, and in many instances doctored, their horses and attended to them as best I could, giving them medicine and treatment which, in my best judgment, they needed from time to time. I don't think I was there at the time (the time of the delivery of the horses), and I did not see the barn man deliver the horses. The barn man was sometimes in the store, and he came in. It would not have been necessary for me to deliver them. The barn man came in and told me that he had delivered them. I went out to Needham's place at the request of Halverson & Company, on the 28th day of May, 1909, for the purpose of preventing them from killing one of the horses, and I told Needham what I came for." The plaintiff Needham testifies that "he had been in his place of business from time to time before the 1st of April, 1909, and had seen Mr. Halverson and Mr. Jackson in charge; " that on the 3d day of April, 1909, he met Mr. Halverson, and that Mr. Halverson guaranteed to him that the horses did not have distemper or any other disease, and "I said under that guaranty I will take the horses. He said, 'You will take them, will you?' and I said, 'You can consider them sold;' but, I said, 'I haven't got room where I am living now. I am going to move. I would like to have you keep them a week or ten days until I can get moved,' and he said,

that would suit him first rate. He said, 'This is the only team I have got, and I can use them right along every day cleaning out the stable.' 'Yes,' he said, 'I can use them.' " The witness further testified that on the 10th day of April, 1909, he went to the store and asked for Mr. Halverson, and the clerk informed him that "he was in Fargo;" that he told the clerk that he came because he had bought a team of horses, and that the clerk informed him that Mr. Jackson was in the barn; that he found Mr. Jackson in the barn, and that they examined the horses together; that Mr. Jackson said: "We guarantee those horses are free from any contagious disease, and if they are not you don't have to pay for them." That the witness said "that is what Mr. Halverson told me, and I will take the horses." And that Jackson went in and untied the horses and led them towards the door and handed him the halters; that the witness then gave the horses to his hired man, and that plaintiff then went into the store and settled for the horses, and that he had his bookkeeper draw up a note and mortgage. Practically all of the transactions with the company in fact, except the first transaction in regard to the contract of sale and purchase, were had through and with the witness Jackson, and it seems quite clear from the evidence that Jackson occupied the position of a joint manager. He certainly was in charge of the premises, and of the sale of the horses during the absence of H. S. Halverson, the vice president and secretary of the corporation, and the horses were delivered and the note signed during such absence. There can be no question that the delivery of the horses was either made actually by him or under his direction. It is clear, also, that if it had not been for his guaranty in regard to the freedom from glanders, or, at any rate, that if he had given any intimation that glanders were present, the plaintiff would not have executed the $300 note and mortgage, and taken the horses. The witness, Jackson, in short; was a party to the original sale, which was not consummated until a delivery of the horses and the execution of the note and mortgage. If this be the case, then his admissions made on the farm of the plaintiff, and when set out, or when he went out, to prevent the destruction of the horses, and to the effect that "I told Halverson that these horses had glanders, and I have been treating them all winter, and if he wants to interfere he will have to interfere himself. That is what makes their noses so red. I have been using a carbonized solution,

and it burned the nose,"—were admissible against the defendant corporation. It is true that Jackson denies having made these statements and questions in some other particulars the testimony of the plaintiff, but the jury evidently believed the plaintiff.

The case of Short v. Northern P. Elevator Co. 1 N. D. 159, 45 N. W. 706, is not antagonistic to this holding. In that case the court said: "There is literally no evidence in the record tending to show that Lighthall 'had charge of that elevator.' Much less is there evidence that he had 'exclusive control of the business connected therewith.' It is not incompatible with the evidence that Lighthall acted in a purely subordinate capacity, and that other officers and agents of defendant had the general supervision of defendant's business at said elevator. It is certain, at all events, that no testimony was put in the record tending to show any general agency in Lighthall."

In the case of Union Bank v. Wheat, 58 Mo. App. 11, the court, on page 15, says: "The defendant further objects that the court erred in permitting the witness, Walker, to testify as to admissions made by Carothers that he was only acting in respect to the exchange of merchandise for the land of Walker as the agent of defendant. It is true these admissions were made after the exchange had been effected, but they were not necessarily inadmissible for that reason. It appears by the evidence that when Walker conveyed his lands to Carothers the latter agreed to discharge certain indebtedness of Walker which was a lien on the land conveyed, and that this agreement had not been kept by Carothers. Walker applied to Carothers to know why he had not done so, when the latter stated as an excuse for his nonperformance that he had only acted as agent for defendant in making the sale of the goods. These admissions of Carothers were made during the continuance of his agency in regard to the transaction with Walker. The discharge of the liens on the land was part of the transaction which Carothers had undertaken to perform. It was as much a part of it as was the delivery of the merchandise. He was speaking of an unexecuted part of the agreement which he had failed to perform. Though long after the delivery of the goods, it was still a part of the transaction not then complete. Anything he said in respect to that matter was admissible to bind his principal, because it was a part of it. His agency, we think, having been established by other proof, his admis-

sions during its continuance in respect to the subject-matter of the same were clearly admissible."

In the case of Standefer v. Aultman & T. Machinery Co. 34 Tex. Civ. App. 160, 78 S. W. 552, a contract for the sale of threshing machinery required the seller to send an expert to put the machinery in operation, and the seller's general and state agent and manager was sent out for this purpose. After making an ineffectual effort to make the machinery operate properly, he admitted that it was a worthless outfit, and was not the machinery he had represented it to be to the buyer, nor the machinery ordered, but that the machinery plaintiff had ordered was torn up in a railroad wreck, etc. Such admissions were held admissible against the seller in an action by the buyer for breach of warranty. "Brown, the agent," the court said, "was engaged at the time in an act in furtherance of the transaction concerning which he spoke, and his statements should have been admitted." It would be difficult to distinguish this case from the one at bar. The witness Jackson had been sent to prevent the destruction of the horses, which had been sold by his company, and which he himself had delivered. It is fair to assume from the evidence that he was sent because the company had warranted the horses, and would be likely to be held liable for a breach of their warranty, and because they held a chattel mortgage on the animals and were interested in the preservation of their security. The setting up of a threshing machine and putting it in operation is not materially different from keeping a horse from being put out of operation. Both acts are for the same purpose, to uphold the guaranty, express or implied, that the machine or the horse is fit for the purposes for which sold. The purpose of Mr. Jackson's visit to the farm was, as he stated, to insist upon an examination before the horses were shot, and to prevent their being shot if possible, and admission by him at the time, that the horses had the glanders and had had the glanders for some time, was certainly an admission in relation to the subject of his agency, though an admission which was extremely injurious to the corporation which he represented. The rule that the statements of an agent are not admissible against his principal if made after the original transaction does not apply where the admissions are made in a transaction which grows out of, and is really in consummation of the original transaction, or while the agent is acting under a new authority.

The rule is laid down by Mr. Mechem in his work on Agency, § 714, as follows: "The statements, representations, and admissions of the agent made in reference to the act which he is authorized to perform, and while engaged in its performance, are binding upon the principal, in the same manner and to the same extent as the agent's act or contract under like circumstances and for the same reason. While keeping within the scope of his authority and engaged in its execution, he is the principal, and his statements, representations, and admissions in reference to this act are as much the principal's as the act itself. Such statements, representations, and admissions are therefore admissible in evidence. . . . The statements, representations, or admissions must have been made by the agent at the time of the transaction, and either while he was actually engaged in the performance or so soon after as to be in reality a part of the transaction. . . . The reason is that while the agent was authorized to act or speak at the time or within the scope of his authority, he is not authorized at a subsequent time to narrate what he had done, or how he did it." In the case at bar the agent, Jackson, was authorized to prevent the destruction of the horses, and in attempting to do so he sought to urge Needham to interfere. The only ground of interference could be that the horses did not have the glanders. While on such mission, he admitted that the horses had glanders, and that he had known of the fact, and that his principal had known of the fact for some time and prior to the sale. These admissions were certainly admissions made in connection with his agency. So, too, it was evidently part of the agreement that no payment need be made for the horses if it turned out that they had glanders. When Jackson went out to ascertain the fact as to whether the horses had glanders or not, he certainly was acting in furtherance of the primary contract. The testimony was admissible at any rate to show the necessity of killing the horses and the right to recover damages therefor.

Nor do we believe that any material error was committed by the trial court in allowing the plaintiff Needham to testify as to the market value of the horses, even though no preliminary foundation was laid except by the proof that he was a farmer and the owner and purchaser; and the question was general in its nature, and was not confined to the locality, but was merely: "What was the market value of that horse at the time these horses were brought by you from Halverson to

your premises?" It is well settled that a farmer may testify without the ordinary and general foundation which is required of expert witnesses as to the value of the land and stock which he owns and has himself purchased. 13 Enc. Ev. 560; 1 Greenl. Ev. 16th ed. p. 430; 1 Wigmore, Ev. § 716; 17 Cyc. 113. Though technically speaking the question was too general and should have been confined to the locality, there can be no doubt that it was understood by the witness to be so confined, and that the defendant was not prejudiced.

When we come to the question of the damages awarded in this case, however, and the measure of damages adopted, we are not so well satisfied with the record. It is true that in a tort action proximate damages may be recovered, and in an action upon the contract damages which might reasonably have been anticipated. We believe that the spread of the disease to the other horses was a damage which was both proximate and which could have been deemed to have been reasonably anticipated as a consequence of a breach of the warranty. Jeffrey v. Bigelow, 13 Wend. 518, 28 Am. Dec. 476. So, too, we believe that damages based upon the expenses of the burials and the fumigations, and the services of the veterinary surgeon, can well be sustained on the theory of expenses incurred in the prevention and reduction of damages, even if not proximate or anticipated. Larson v. Calder, 16 N. D. 248, 113 N. W. 103. But beyond this we cannot go. The plaintiff cannot recover for the value of the possible use of teams which might or might not have been used in plowing or breaking or harvesting, nor for the loss of crops which might or might not have been planted or raised. Such damages are both more or less speculative, and are lacking in proximity, and the direct chain of causation, and can hardly be said to have been anticipated. It is to be remembered, also, that the pleadings themselves limit the recovery for the services of the men in caring for, doctoring, and burying the horses, and for the cost of disinfectants to the sum of $50. This sum the plaintiff is entitled to recover under the evidence and the verdict of the jury. He is also entitled to the sum of $960 for the five horses destroyed, and to at least $3 a day for five days, or $15, for the loss of his own time. These items amount in all to the sum of $1,025. The defendant, on the other hand, is entitled to an offset of $336, the amount of the note and interest, and $50 for the amount actually received by the plaintiff from the state for

the horses ordered killed. He is not entitled to offset further sums which may or may not be recovered from the state, at any rate at this time. This gives to him a credit of $386. The verdict of the jury was for $950.75. The judgment of the trial court, together with costs and interest, was $1,043.90. If the plaintiff will remit from such judgment the sum of $311.75, within twenty days of the filing of the remittitur in the district court, the judgment of the district court as so modified will be allowed to stand. If the plaintiff does not desire to consent to this modification, the judgment of the trial court will be reversed and a new trial is ordered.

Mr. Justice BURKE, being disqualified, did not participate.