## WILLIAM STEINBACH v. STEPHEN BAUCLAIR and Ellen Bauclair.

### (164 N. W. 672.)

**Fraud not presumed — circumstantial evidence — may be established by — reasonableness of evidence — conclusion of fraud — must preponderate towards — good faith — honest mistake — may be inferred — law presumes innocence — guess — work — conjecture — jury — must not indulge in.**

1. "Fraud is not to be presumed. It must be proved. And while it may be established by circumstantial evidence, yet if the reasonable inference from all such evidence does not preponderate toward the conclusion of fraud, then such evidence will not sustain such finding. If, from the entire evidence on the subject, good faith, or an honest mistake even, may be as rationally and reasonably inferred as fraud, then the law leans to the side of innocence. Though the inference of fraud may be drawn from facts and circumstances, such fraud must not be the guesswork or conjecture of a jury, but the inference must be the rational and logical deduction from the facts and circumstances."

**Jury — findings of — evidence — sustained by.**

2. A finding by the jury that no fraud was committed is *held* to be sustained by the evidence.

**Fraud — evidence — finding by jury of no fraud — sale of stallion — defects — examined by purchaser — evidence.**

3. Evidence that, at the time of the sale of a stallion, a defect or bruise was found on its front feet, and that the purchaser examined the same, and that the seller said that he believed it was occasioned by the horse stepping upon itself, in connection with the fact that the sale of the horse was not urged upon the purchaser, but others were offered in preference thereto, does not as a matter of law prove fraud and deceit as to the breeding capacity of such animal, even though later on sidebones developed.

Opinion filed July 25, 1917. Rehearing denied October 5, 1917.

---

NOTE.—For authorities discussing the question as to what amounts to breach of warranty of soundness of a horse, see note in 32 L.R.A. (N.S.) 182.

Action for the purchase of a horse. Counterclaim in fraud and deceit.

Appeal from the District Court of Eddy County, Honorable *C. W. Buttz,* Special Judge.

Judgment for plaintiff. Defendants appeal.

Affirmed.

Statement of facts by BRUCE, Ch. J.

This is an action to recover on two promissory notes, each for the sum of $400. The answer is a qualified, general denial. It admits the execution of the notes. It alleges that, in addition to the two notes mentioned, the defendants at the same time executed still another for the sum of $350, and paid the plaintiff the further sum of $350 in cash. All of this, defendants allege, was in payment of a certain French draft stallion named "Tapen." It then alleges: "That said plaintiff warranted and represented to these defendants said stallion to be in all respects sound and healthy, a good breeder, and in good breeding condition; that these defendants expressly relied upon said warranties and representations in all things and believed the same, and that by reason of said warranties and representations so expressly made by said plaintiff, these defendants executed and delivered the notes aforesaid and paid said plaintiff the sum of $50.

"That said horse was not sound or in good health, and was not a good breeder, and that it was at the time of said sale suffering from a disease of the throat known as acute laryngitis, and suffering from the disease of the legs known as sidebones, and that said stallion was not a good breeder, and was of little or no value for breeding purposes or otherwise, and that said plaintiff further represented the said horse to be of the value of of $1,200, but that by reason of his diseased condition, his unsoundness, poor health, and that he was a poor breeder, said horse was valueless and of no value whatsoever, and that by reason thereof said defendants received no consideration for the said notes described in plaintiff's complaint, or the other note executed and delivered to plaintiff, or the cash paid by said defendants to plaintiff at said time; that the said unsoundness of said stallion, his want of health, diseased condition as to sidebones and as to his throat, was known to the said

plaintiff at the time of the sale and delivery of the said stallion to these defendants by said plaintiff."

In addition to this answer a counterclaim was filed which substantially sets forth the facts pleaded in the answer, and alleges that the defects complained of and the warranty before mentioned were well known to the plaintiff, and the defendants relied upon the warranty; that said warranty and representations were false and were made with intent to cheat and defraud the defendants; and that as soon as the defendants discovered that said stallion was unsound and unfit for breeding purposes, as hereinbefore stated, they offered to return him to the plaintiff and demanded the return of said notes, but the said plaintiff refused to accept said stallion, and that said stallion died in October, 1913.

It then alleges damages to the extent of $1,200.

The jury returned a verdict for the plaintiff for the sum of $800 and interest, and from the judgment entered thereon the defendant appeals.

*James A. Manly* and *Knauf & Knauf,* for appellants.

The fact that defendant retains the property, or that it died in his possession, does not prevent him from recovering damages by reason of the breach of the conditions, as such knowledge is not a bar to the reliance on the warranty. Northwestern Cordage Co. v. Rice, 5 N. D. 432, 57 Am. St. Rep. 563, 67 N. W. 298; Simonson v. Jenson, 14 N. D. 417, 104 N. W. 513; Andrews v. Peck, 83 Conn. 666, 32 L.R.A. (N.S.) 184, 78 Atl. 445, 21 Ann. Cas. 1000.

The defendants were clearly within their rights in pleading their damages and the whole thereof, even though the notes had not been paid and there was one still outstanding and unpaid. Fahey v. Esterley Mach. Co. 3 N. D. 220, 44 Am. St. Rep. 554, 55 N. W. 580; Northwestern Port Huron Co. v. Iverson, 22 S. D. 314, 133 Am. St. Rep. 920, 117 N. W. 372.

Defendants are required to plead the total amount of their damages, and cannot plead the same into several actions. This action was brought when the first note became due, and defendants are entitled to have the total of their damages sustained on first cause and cannot split the same into several defenses, and in this defendants were clearly within

the requirements of the law. Bowe v. Minnesota Milk Co. 44 Minn. 460, 47 N. W. 151; Jungnitsch v. Michigan Malleable Iron Co. 121 Mich. 460, 80 N. W. 245; Case Mfg. Co. v. Moore, 144 N. C. 527, 10 L.R.A.(N.S.) 734, 119 Am. St. Rep. 983, 57 S. E. 213; 23 Cyc. 1201.

A party has the privilege of keeping the property and suing for damages for breach of warranty, and the court cannot invade the province of the jury and in any manner determine for them the amount of damages they shall find except to limit the jury to the amount stated in the prayer for relief. Simonson v. Jenson, 14 N. D. 417, 104 N. W. 513; Spaulding v. Pitts, 26 S. D. 78, 127 N. W. 610.

Plaintiff refused to take back the stallion when tendered to him by defendants; and the horse, within the period allowed for such return, died, making it impossible to make return. Defendants cannot be held liable as for a failure to return. Lyons v. Stills, 97 Minn. 514, 37 S. W. 280.

One is not required to perform a useless act, and when plaintiff refused to take back the horse when offered to him by defendants within the allowed time, the law did not require defendants to perform further, and they should have been allowed to prove the worthless breeding qualities of the horse, and under these circumstances the court erred in refusing such offered proof. Ohio Thresher & Engine Co. v. Hensel, 9 Ind. App. 328, 36 N. E. 716.

In the sale of a horse the vendor may make both a false warranty and a false representation, and become liable to the vendee for the deceit and for the breach of warranty; and the vendee would correspondingly have two grounds of recovery, but would only be entitled to one relief in damages. The vendee in such a case can sustain an action based upon either right of action alone, or, since both arise out of the same transaction, he may base his action upon both grounds. Needham v. Halverson, 22 N. D. 594, 135 N. W. 203; Murphy v. McGraw, 74 Mich. 318, 41 N. W. 917; Humphrey v. Merriam, 39 Minn. 502, 35 N. W. 365; Larson v. Calder, 16 N. D. 248, 113 N. W. 103.

The court charged the jury to disregard the solemn and express warranty of soundness made by plaintiff; not to give defendants the benefit of the breach of contract, the court wholly failing to recognize the two elements of the defense—one on contract of warranty or arising on

contract, and the other on tort for false representations and deceit and fraud. This was error for which a new trial should be granted. Needham v. Halverson, 22 N. D. 594, 135 N. W. 203; Humphrey v. Merriam, 37 Minn. 502, 35 N. W. 365; Murphy v. McGraw, 74 Mich. 318, 41 N. W. 917.

*Rinker & Duell,* for respondent.

While an action of fraud and deceit may be joined with an action for breach of warranty, an action for fraud and deceit may lie where there would be no action for breach of warranty, and the court adopted the correct theory when the jury was instructed to the effect that they had nothing to do with the matter of warranties, but only with reference to the defendants being induced to make the contract through fraud, deceit, and false representations on the part of plaintiff. McQuaid v. Ross, 77 Wis. 470, 46 N. W. 892.

Where property is sold under written contract containing express warranties as to certain matters, no other warranties can be implied, nor can evidence of other warranties be offered. DeWitt v. Berry, 134 U. S. 306, 33 L. ed. 896, 10 Sup. Ct. Rep. 536; J. I. Case Plow Works v. Niles & S. Co. 90 Wis. 590, 63 N. W. 1013; Davis v. Iverson, 5 S. D. 295, 58 N. W. 796; Sockman v. Keim, 19 N. D. 325, 124 N. W. 64; Hitchcock v. Gothenburg Water Power & Irrig. Co. 4 Neb. (Unof.) 620, 95 N. W. 638.

Fraud is never presumed, but must be pleaded and proved. The proof must be clear and distinct. New York L. Ins. Co. v. Davis, 96 Va. 737, 44 L.R.A. 305, 32 S. E. 475; Ely Walker Dry Goods Co. v. Smith, — Okla. —, 160 Pac. 898.

"If from the entire evidence on the subject good faith or honest mistake may be as rationally and reasonably inferred as fraud, then the law leans to the side of innocence.' Alter v. Bank of Stockham, 53 Neb. 223, 73 N. W. 667; Webb v. Darby, 94 Mo. 621, 7 S. W. 577; 9 Decen. Dig. "Fraud," Key No. 58 (1) and (2).

On the sale of a stallion where the seller gives to the purchaser all information at hand concerning such horse, statements made in such manner do not constitute fraud and deceit. McCabe v. Desnoyers, 20 S. D. 581, 108 N. W. 341.

The evidence fails to show that plaintiff knew anything concerning the horse which, if it had been communicated to defendant, would have

destroyed the inducement which led defendant to buy. Webb v. Darby, 94 Mo. 621, 7 S. W. 577; Davis v. Iverson, 5 S. D. 295, 58 N. W. 796.

There was no tangible evidence of fraud, deceit, or misrepresentation. Sockman v. Keim, 19 N. D. 325, 124 N. W. 64, and cases cited; Davis v. Iverson, and McCabe v. Desnoyers, supra; Fitzhugh v. Nirschl, 77 Or. 514, 151 Pac. 735.

If defendant's evidence does not disclose misrepresentation, fraud, or deceit on the part of the plaintiff, erroneous instructions on that subject, or on other subjects in the case, would not amount to prejudice, for defendants can recover only on the theory of fraud and deceit. South Omaha v. Fennell, 4 Neb. (Unof.) 427, 94 N. W. 632; Braddock v. Louchheim, 87 Fed. 287, 34 C. C. A. 684, 94 Fed. 1021.

Upon a sale of personal property under a conditional warranty, and providing for a return of the property, a return is necessary before suit, as in the contract provided. Simonson v. Jenson, 14 N. D. 417, 104 N. W. 513.

The point of time to which the evidence must be directed is that of the date of which the contract of warranty was made. The object of evidence must always be to show the condition at the time of the sale. 2 Enc. Ev. 611.

Plaintiff disclosed to defendants the basis of his information and knowledge as to the horse. This refutes the idea of fraud and deceit. McCabe v. Desnoyers, supra.

One who impugns a transaction as fraudulent is not sustained by his own assertion alone in case he is disputed, but has the burden of making his allegation good by independent evidence. Hutchinson v. Poyer, 78 Mich. 337, 44 N. W. 327.

The jury having found the defendants were not entitled to recover anything, an erroneous instruction in this connection would be harmless. Fitzhugh v. Nirschl, 77 Or. 514, 151 Pac. 735; 2 Decen. Dig. Appeal and Error, Key No. 1068; South Omaha v. Fennell, supra; Sockman v. Keim, 19 N. D. 325, 124 N. W. 64; McCabe v. Desnoyers; Davis v. Iverson; and McQuaid v. Ross,—supra.

BRUCE, Ch. J. (after stating the facts as above). The principal error alleged is based upon the action of the court in limiting the testi-

mony to matters concerning fraudulent and deceitful representations, alleged to have been made during the sale, as to the general physical condition of the animal, but precluding the defendants from offering any evidence as to the lack of breeding capacity of the animal, as the same was covered by a specific warranty; and the conditions attached to such specific warranty were neither alleged nor proved to have been complied with. In this, however, we believe no error was committed. The specific warranty, and in fact the only warranty, was as follows: "It is agreed that if said stallion in proper health and condition and properly fed, nourished, and cared for and bred to not more than two mares daily during the next regular season of 1913, said season to begin April 15th and end July 15th, does not get 50 per cent of the mares of breeding age and in breeding condition, bred to him, in foal, and said stallion is delivered back to me at New Rockford, North Dakota, in as good health and condition and as sound as he now is not later than January 1, 1914, I will deliver to said purchaser in exchange for said stallion another stallion of equal value. Provided, however, that said buyer mail me by registered mail at New Rockford, North Dakota, not later than August 1, 1913, a full list of the mares bred to said stallion, with names of owners, description, age, and names of mares, with their dates of service and trial, it is agreed by said buyer that said stallion is accepted by him sound and healthy and in good breeding condition. Further, vendor sayeth not."

There is some testimony in the case which tends to show that the defendants tendered the horse back to the plaintiff sometime in August, 1913, but this merely on the ground that the animal was afflicted with sidebones. There is also evidence that the horse died in October, 1913. There is no evidence, however, that at that time any complaint was made of the lack of breeding qualities of the animal, and there is absolutely no contention or evidence that the list of the mares bred to said stallion, with the names of owners, description, age, and names of mares, with their dates of service and trial, was ever furnished or offered to be furnished to the plaintiff; at any rate, before the date of the trial or prior to August 1, 1913, as provided for in the warranty.

There can be no question of the importance and materiality of the requirement of the list of the mares bred. It was incorporated into the contract so that an investigation could be made while the evidence

was yet fresh, and that opportunity might be afforded to investigate dishonest claims. "The purpose of such a stipulation is not to escape liability, but to facilitate prompt investigation. And, to this end, it is a precaution of obvious wisdom, and in no respect repugnant to public policy." See opinion of Mr. Justice Holmes in Georgia, F. & A. R. Co. Blish Mill. Co. 241 U. S. 190, 60 L. ed. 948, 36 Sup. Ct. Rep. 541.

This being the case, it seems perfectly clear that, as far as the answer is concerned, the warranty as to breeding capacity cannot be relied upon, and that the evidence objected to was properly excluded. There is certainly nothing in this agreement or warranty, or in this requirement of a list of the mares bred, that is in any way harsh, or unreasonable or violative of sound rules of public policy, and as far as the answer is concerned, therefore, the action of the court was unquestionably correct.

But was the evidence admissible in so far as the counterclaim is concerned? We think that it was not. We also are of the opinion that no error was committed in the instructions which were given.

The counterclaim alleged that "at the time of the execution of said notes mentioned in the complaint, to wit, July 15, 1912, defendants purchased of the plaintiff a French draft stallion named "Tapen" for breeding purposes; . . . that at the time of the purchase of said stallion and the execution of said notes the plaintiff warranted and represented to the defendants that said stallion was in all respects sound and healthy, a good breeder, and in good breeding condition as warranted and represented.

"That the defendants believed and relied upon said warranty and representations, and purchased said stallion for the sum of $1,200 and executed and delivered to the plaintiff said notes as aforesaid; that at the time of said warranty and representations and sale said stallion was not sound and healthy, was not a good breeder and in good breeding condition as warranted and represented by plaintiff, but was suffering from a disease of the throat known as acute laryngitis, was not a good breeder and in good breeding condition, all of which facts were well known to the plaintiff at the time he sold and warranted said stallion as aforesaid.

"That said warranty and representations were false and were made

by the plaintiff with the *intent to deceive the defendants* and to induce them to purchase said stallion, and that defendants were deceived and defrauded by the falsity of said warranty and representations.

"That the plaintiff sold said stallion to the defendants, knowing that defendants wanted him for breeding purposes, and knowing that defendants relied upon his warranty and representations as to the soundness and health of said stallion, and also as to the fitness of said stallion for breeding purposes, and knowing that said stallion was diseased and unfit for breeding purposes as aforesaid, and that he was unsound and not in good health, and *knowing that defendants would not have bought said stallion* or executed said notes had they known the condition of said stallion; yet the plaintiff fraudulently and deceitfully concealed the true condition of said stallion from defendants, and failed and neglected to inform the defendants of said diseased condition of said stallion and his unfitness for breeding purposes."

The question is whether, under such a counterclaim and in the absence of a fulfilment on the part of the defendants of the conditions in regard to the list of mares served, etc., it was competent for the defendants to show, as they offered to show, that 111 mares were bred between April 15 and July 15, 1913, and the result of such breeding; that the stallion was in good hands and properly cared for and served not to exceed two mares a day, and that of all the mares so served, not to exceed forty-four, were gotten in foal, including dead as well as living colts; and did the court err in instructing the jury that they did not have anything to do with the foal-getting qualities of the horse?

We think that it did not err.

The counterclaim is based not upon the warranty, but on frand and deceit. The bill of sale contained an agreement on behalf of the defendants that it was "agreed by said buyer that said stallion is accepted by him sound and healthy and in good breeding condition." The question on the counterclaim was whether the agreement entered into by the defendant was brought about by deceit or fraudulent representations made to him with reference to such soundness and health and breeding capacity.

The only question then is whether there was any evidence which tended to show fraud and deceit on behalf of the plaintiff at or before the time of the sale and in regard to the breeding capacities of the

animal. If there was, the evidence which is objected to is competent as tending to show the falsity of the representations.

On this subject the defendant Bauclair testifies in effect:

Well, I went out there to see what he had to offer, and he showed me what horses he had on the place, and he took me to see the horse, and we talked about the horse. He suited me pretty well, the size and everything, and I asked him if the horse was sound and all right. He says, "This horse is sound and all right;" and he says, "I will show you his papers." He showed me the papers of the horse and license, and then, too, we spoke several times in regard to the condition of the horse. I asked him if the horse was sound and all right, and he particularly said that he was sound and all right, and showed me his papers and license to show he was sound. I have never had any experience with horses of this kind before. I never owned a stallion before.

Q. Now, Mr. Bauclair, what, if anything, was said by him to you about his breeding qualities?

A. He said he was sure.

Q. What, if anything, was said by him to you about what per cent he would get, if anything?

A. It was, he figured, about 80 per cent. That was the talk between us. He said about 80 per cent.

Q. What did he say about guaranteeing any per cent?

A. He said 60 per cent, he would guarantee that. That is what he told me at the farm in the house. The next time I saw the horse is when I took it home; that was when we closed the deal, probably pretty near a month afterwards. At the time we had this conversation the horse was in view. I had been looking at the horse.

Q. Did you tell him for what purposes you wanted the horse?

A. Yes, sir. We talked of many things and a good many things were said. I told him what I wanted him for, and he said what he thought he would do, and so on. I couldn't just give the conversation. When he told me that the animal was sound I believed his statement. I relied on that statement. I had never seen the horse before this occasion and knew nothing about him. When he told me he would get 60 per cent and he was a good foal getter, I believed his statement in that regard. I relied on it in making the deal.

Q. What do you mean?

A. Why, I relied on 80 per cent. He told me he would guarantee 60 per cent.

The veterinarian, E. H. Fitch, testifies that he examined the horse in July, 1912, and that he found that it had sidebones and that the cartilage was ossified. He testified that a stallion afflicted with sidebones has a tendency to transmit the same to its offspring, and that a stallion is not supposed to be used for breeding purposes that has sidebones. An objection was then made and sustained to a question asking him if he owned any colts out of the horse Tapen. He then testified that a horse with sidebones would be apt to produce offspring that didn't have them, but more frequently that did, and he didn't think they should be used. He testified that he believed that the State Registration Law provides for the giving of certificates in certain cases, and citing therein that the horse has sidebones, and they license him to go ahead and stand.

Bauclair further testifies that before purchasing the horse he looked him over as to size, and examined some of his colts,—some seventy or eighty,—as many as he kept, and that he was relying partly on his own investigation in buying the stallion. He says that Steinbach told him in the house that the horse was sound. "He said that the horse was sound and all right, and, 'I will show you the papers;'" and that he showed him the papers, and he looked them over a little and he looked over the horse then a little later on. "At the time he sold the horse he delivered to me the pedigree and license,—the whole bunch of papers; that Steinbach told me that the horse was a sure breeder, and that he believed I could figure on 80 per cent. He said I could figure on that, and then later he substituted that for the year's work. The last year. I saw what the horse had done before that. He didn't tell me about the past of that horse. He may have told me about the record of that horse or what he had done before, which I believe he told me, that he came into the possession of the horse in the spring of 1912, so that I knew he hadn't used the animal for a year before.

Q. And didn't he tell you that the man he bought the horse from had told him that he could figure on 75 or 80 per cent of the colts?

A. I would not say positively whether he did or he didn't.    He might have.

Q. Now, don't you remember he told you those were what the man he bought him from told him that he could figure on 80 per cent?

A. I don't remember that.    At the· time when I looked at the horse, before the notes were given, I looked at the front feet.    I ran my hands over them; felt of them.    I called Mr. Steinbach's attention to something on the front legs.    It was on this one here.    I asked him what that was.    He said it was nothing.

Q. What did you say?

A. I had his word for it that it was a bruise or something like that.    I called his attention to that at that time.    Neither he nor I said anything about sidebones.

Q. And never knew anything about the horse having sidebones until you got this certificate you testified to, the next year?

A. I found out then.    I didn't know my horse had them.    I found it out about the 1st of May, when I got those papers back.    Then I spoke to Mr. Steinbach about the matter, and told him the horse had sidebones.    He told me he did not.    I told him my paper shows that he has.    He said if the horse was affected that way he would throw off $200.    He said he didn't want to take the horse back and that he would come down $200.    Until I found the horse had what is called "sidebones" I was well pleased with it in every particular.    I told Mr. Steinbach that several times.    In none of my talks with Mr. Steinbach did he admit that the horse had sidebones when he sold him to me, and so far as I know, Mr. Steinbach himself didn't know any more than I did that the horse was affected with sidebones at the time he sold him to me.    I first noticed those lumps on the horse's feet that are spoken of as sidebones when the papers came back.    He wasn't limping at the time that I got him,—not that I noticed. . He began to limp the same fall that I got him.    I noticed him favoring his feet—limping.

Q. Did you notice that in the summer when he was traveling?

A. I thought it was his shoes, and I had them changed.

Q. Did he limp then?

A. The next spring I didn't notice it so much.    When I bought the horse I could pick out any I wanted.

Louis Bauclair, the son of the defendant, testifies that at the time he brought the horse home in July, 1912, he noticed growths on the feet.

Dr. Babcock, a state veterinary inspector, testified that he examined the horse in 1910, and more than a year prior to the sale; that the disease of sidebones lessens the value of a horse as a breeding animal; that when he examined the horse there was nothing in particular in the front feet to indicate sidebones; that he again examined the horse in 1913; that he treated it in the spring of 1912 for acute laryngitis; that he made no examination for sidebones in 1912; that there were sidebones in the spring of 1913; that it would take about three months to develop sidebones.

Q. I believe you examined him in 1910, didn't you?

A. Yes, sir. I examined his front feet at that time.

Q. Well, Doctor, what did you observe about these front feet at that time?

A. Nothing in particular in regard to the front feet.

Q. I mean the general conformation of the legs or feet,—anything that would indicate a predisposition to the disease of sidebones that you observed?

A. The conformation was faulty. The pasterns were too short and too straight.

Q. I will ask you whether or not a horse with that faulty conformation is more subject to sidebones than a horse with a proper conformation? (Objected to by counsel for defendant, and objection sustained.)

Q. From your examination at that time of that horse, did it appear to you at that time that the horse, in all probability in your judgment, would develop sidebones; basing your answer upon the examination of the horse at that time? (Objected to by counsel for the defendant, and objection sustained.)

Q. You say you examined the horse in 1910?

A. Yes, but that wasn't my first knowledge of the horse.

Q. What sort of an impression or what kind of an impression did you form of this horse as a breeder at that time?

A. Barring faulty conformation of the front feet, I considered him a very fair animal.

Q. And at that time I believe you stated there were no sidebones on the horse?

A. Yes, sir, there were no sidebones in evidence.

Q. And while there was that faulty conformation, it was possible that no sidebones would ever occur on the horse at the age he was, wasn't it?

A. It would be possible with proper care that they never would develop.

The testimony of the plaintiff, Steinbach, absolutely denies any knowledge of the existence of sidebones. He states that the defendant was given the choice of taking any horse that he wanted, and was not urged to take the one in question, and that he examined his legs before taking him. He also testifies that he based his representations of the soundness of the animal on what Dr. Babcock told him and on the papers he had received from the Agricultural College, and that he told the defendant of this fact.

It would seem from all of this evidence that the only suggestion of fraud is the possible fact that at the time of the purchase there was a swelling of the foot of the animal which might develop into a sidebone, and that the plaintiff stated that the swelling might have been occasioned by a bruise, and the later fact that sidebones developed. There is absolutely no proof that the plaintiff knew that the horse had sidebones beyond this fact, and there is positive proof that defendant himself examined the horse to a greater or lesser extent and himself examined the feet, and relied largely on his own judgment.

"Fraud is not to be presumed. It must be proved; and, while it may be established by circumstantial evidence, yet if the reasonable inference from all such evidence does not preponderate toward the conclusion of fraud, then such evidence will not sustain such finding. In other words, if, from the entire evidence on the subject, good faith or an honest mistake even may be as rationally and reasonably inferred as fraud, then the law leans to the side of innocence. While, to prove fraud direct evidence is not essential, and the inference of fraud may be drawn from facts and circumstances, such inference must not be the guesswork or conjecture of a jury, but the inference must be the rational and logical deduction from the facts.

and circumstances from which it is inferred." Alter v. Bank of Stockham, 53 Neb. 223, 73 N. W. 667; New York L. Ins. Co. v. Davis, 96 Va. 737, 44 L.R.A. 305, 32 S. E. 475; Ely Walker Dry Goods Co. v. Smith, — Okla. —, 160 Pac. 898; Webb v. Darby, 94 Mo. 621, 7 S. W. 577.

We are unable to find any evidence on which we can premise any suggestion of fraud, and which would justify us in overturning the verdict of the jury. Especially as the undisputed evidence shows that the plaintiff was in no manner anxious to sell the particular horse; that he stated to the defendant that he wanted to keep it for breeding purposes and to fill some breeding contracts; that he offered the defendant other horses; and that he was in fact urged into the sale by the defendant himself.

The only defect in the breeding capacity, and this did not go to capacity, but merely to whether persons would desire the services of the horse and whether a sidebone might be transmitted to the offspring, was a possible tendency to a sidebone or the beginning of such a disease. The only claim made is that the plaintiff said that the horse was a good breeder, and it is absurd to contend that this statement was fraudulently made, or was in fact false, merely because of the possible defect in the foot.

Such being the case, not only was there no exclusion of competent testimony, but such exclusion was not prejudicial.

We agree with counsel for appellant that if the jury believed the testimony of the defendant to the effect that he called the plaintiff's attention to the swelling on the foot of the horse at the time of the sale, and that the plaintiff told him that it was nothing, and that the horse had probably been stepped on, that fraud might be found if they found that he stated something as a fact which he did not know to be true or was deliberately false. We believe, however, that this matter was properly submitted to the jury. It is true that the court told the jury that they didn't have anything to do with the foal-getting qualities of the horse. This, however, was correct, as the only possible effect that the sidebones or tendency to sidebones would have had would have been in the possible transmission of the tendency to colts, and there is no evidence or attempt to prove that any of the colts had this tendency. The evidence sought to be introduced, in-

deed, was that but few colts were produced, and not that the colts that were produced were in any way defective.

The court specifically charged the jury that "there is a matter, however, with which you are concerned, and that is this: 'It is agreed by said buyer that said stallion is accepted by him sound and healthy and. in good breeding condition.' Now, if Mr. Bauclair made such an agreement as that, and I say to you that he did by reason of having accepted this bill of sale,. he is bound by that unless he was induced or gotten to enter into this contract through fraud and deceit of Mr. Steinbach. Now, a contract that one has entered into through fraud and deceit is not binding upon him. In order to make a contract, the minds of the men making it must meet upon the same propositions; and the law says that, if their consent is not free, then they are held not to have a contract, because their minds didn't meet freely, fairly, and openly; and the law says further that, if a man is induced to enter into a contract by fraud or deceit, then his consent to the contract wasn't free, and he is not bound by it. Now, it is for you to determine, under all the evidence in this case, whether or not Mr. Steinbach got Mr. Bauclair to enter into this contract, with reference to the buying of this horse, by deceit or fraudulent representations to him, with reference to the soundness and health conditions of this horse. Remember you don't have anything to do with the foal-getting qualities of this horse. Now, gentlemen of the jury, the first matter for you is this: What were the representations made by Mr. Steinbach to Mr. Bauclair with reference to the health and conditions of this horse, as to the soundness and the other matters spoken of? What those representations were, you must get from the evidence as given by the witnesses on the witness stand in this case. You have heard the evidence and testimony given by witnesses on both sides of this case as to what those talks were between those men and what those representations were, and it is for you to determine what the real truth is, and exactly what representations were made by Mr. Steinbach to Mr. Bauclair with reference to those matters. Did Mr. Steinbach make the representations to Mr. Bauclair which Mr. Bauclair claims he made to him? And if he did make such representations to Mr. Bauclair as Mr. Bauclair claims, were those representations fraudulent under our law? Now, our Code says: 'Actual fraud, within the meaning of this

chapter, consists in any of the following acts committed by a party to the contract or with his connivance with the intent to deceive another party thereto, or to induce him to enter into the contract:

" '(1) The suggestion as a fact of that which is not true by one who does not believe it to be true.

" '(2) The positive assertion in a manner not warranted by the information of the person making it of that which is not true, though he believes it to be true,' and that last proposition is the one involved in this case so far as any element of fraud may be concerned. I will read it again. 'The positive assertion in a manner not warranted by the information of the person making it of that which is not true, though he believes it to be true.'

"Now, then, in the first place did Mr. Steinbach make any representations to Mr. Bauclair which were not true? If you find he didn't, why then, of course, you will be through with that. If you find he made representations to Mr. Bauclair which were not true, though he believed them to be true, the question in the case would then be, Would the information that Mr. Steinbach had about those matters warrant him fairly as an honest man in making those statements? . . .

"Remember you haven't anything to do in this case with the matter of warranties so far as the warranties are concerned, but you should only go back to talks leading up to this sale,—the talks between these men,—in order to determine whether or not Mr. Bauclair was led into the making of this contract through misrepresentations, through fraud and deceit by Mr. Steinbach as I have defined those matters to you."

It would appear to us that these instructions, and the instructions as a whole, clearly presented the only issue in the case to the jury. That sole issue was whether the plaintiff was guilty of fraud and deceit in regard to the question of sidebones; for, as we have before stated, the question of the warranty of the breeding capacity of the animal was out of the case.

The judgment of the District Court should be and is affirmed.

GRACE, J. (dissenting). It will be noticed that the warranty contained in the bill of sale is a specific warranty, and relates exclusively to the certainty of the propagating qualities of such stallion, and the percentage is fixed at 50 per cent of all mares of breeding age and in

breeding condition, bred to such stallion, to be in foal. It will be noticed that this specific warranty had attached to it certain conditions which were to be performed by the purchaser, such as the proper feeding, nourishing, and caring for of such horse, and other conditions, which are all set forth in such bill of sale, all of which relate to the specific warranty.

It appears from an examination of the answer that the defendants have set forth and relied upon two defenses to the collection of said notes, and in addition to these two defenses pleaded a cause of action against the plaintiff by way of counterclaim. The defenses relied upon by the defendants are: (1) A specific written warranty that the stallion was a good breeder and in good breeding condition; (2) that the plaintiff fraudulently and deceitfully concealed the true condition of said stallion.

We are of the opinion that the express written warranty in a bill of sale excludes proof of any oral warranty made at the time or prior to the sale of the property in question. No further attention, therefore, need be paid to the defendants' claim based upon the oral warranty. 35 Cyc. 379, subd. 7, and list of cases cited thereunder.

In this case the defendants could offer testimony and proceed under every defense or cause of action which they had. Each cause of action which the defendants had arose out of the same transaction. They had a cause of action for the breach of the specific warranty as to the breeding qualities of the stallion; a cause of action arising out of the alleged fraudulent and deceitful representations concerning the stallion; and a cause of action based upon their counterclaim. Out of all such causes of action arising out of the same transaction they are entitled to only one relief in damages. The defendants, under such conditions, could have maintained an action based upon either right of action alone, or based upon all their rights of action arising out of the same transaction, but would receive only one relief in damages. Needham v. Halverson, 22 N. D. 594, 135 N. W. 203; Murphy v. McGraw, 74 Mich. 318, 41 N. W. 917; Larson v. Calder, 16 N. D. 248, 113 N. W. 103; Humphrey v. Merriam, 37 Mich. 502, 35 N. W. 365; Freer v. Denton, 61 N. Y. 492.

The defendants had a legal right, even though the notes were not paid, to plead the breach of warranty and the damages consequent to

such breach of warranty as a defense, and had the further right to plead their damages by way of counterclaim, the notes being non-negotiable, and have such damages, if any, applied toward the reduction of the amount of said notes; or, stated in another way, have such notes applied in liquidation of such damages. Fahey v. Esterley Mach. Co. 3 N. D. 220, 44 Am. St. Rep. 554, 55 N. W. 580; Northwest Port Huron Co. v. Iverson, 22 S. D. 314, 133 Am. St. Rep. 920, 117 N. W. 372.

The action was brought when the first note became due, and the total amount of damages due, if any, are entitled to be pleaded and proved in this first action, and such damages, if any, applied to the notes in question. Bowe v. Minnesota Milk Co. 44 Minn. 460, 47 N. W. 151; Jungnitsch v. Michigan Malleable Iron Co. 121 Mich. 460, 80 N. W. 245.

It appears from some testimony in this case that the defendants tendered the horse back to the plaintiff, and that plaintiff would not receive the horse back. It appears, also, that the horse afterwards died while in the possession of the defendant. Having tendered the horse back, if we may consider such testimony as true, the fact that the horse afterwards died does not prevent the defendant from recovering whatever damages he may have sustained by reason of the breach of the warranties. The specific warranty contained a condition that the stallion should be returned if it did not correspond to the specific warranty and another stallion of a certain value should be exchanged. Even with such a condition in the specific warranty, if the horse died before any offer to return the same, still it seems that it would be proper for an action for damages to be maintained for the difference in the value of the stallion as warranted and represented at the time of the sale, and as he actually was.

The defendants assign forty-five causes of error. We feel that it is entirely unnecessary to consider all of them, for most of them result from a wrong theory of the case assumed by the trial court. The trial court limited the testimony to matters concerning fraudulent and deceitful representations, if any, made during the sale of the stallion, and would not permit the introduction of any testimony concerning the specific warranty contained in the bill of sale, on the ground that the conditions attached to such specific warranty were alleged not to have

38 N. D.—16.

been complied with, and therefore the testimony offered was claimed to be incompetent. The trial court refused to receive testimony concerning the performance of or compliance with the specific warranty as to the breeding qualities of the stallion. We are convinced the court was in error in this regard, and the court should have admitted testimony concerning the conditions which were to be observed under the specific warranty. The exclusion of all such testimony relating to such warranty contained in the bill of sale constitutes prejudicial and reversible error.

Considering errors Nos. 6, 7, and 8, it is evident that the court erred in not admitting the testimony as to the number of mares bred to the stallion in the year 1913. The court having excluded the testimony concerning the breeding of such mares, and the defendant reduced his offer to writing, and with Stephen Bauclair on the stand testifying, the defendants in this case offered to show that one hundred eleven mares were bred between April 15, and July 15, 1913, and that the stallion was in the hands of a competent caretaker, properly cared for, and served not to exceed two mares a day, and of the mares so served not to exceed forty-four were gotten in foal, including dead as well as living colts. This testimony went to the very conditions which were set forth in the bill of sale concerning the specific warranty. It was the proper time and place to prove all the conditions which were contained in such specific warranty and such bill of sale. The defendant had a right to bring competent testimony into court to show and prove by such witnesses under oath, that each and every condition in such specific warranty contained in such bill of sale had been fully complied with. It was not incumbent upon the defendants to show that they had compiled the list of mares spoken of in the specific warranty, and sent such list of mares to the plaintiff by August 1, 1913. The parties were now in court under oath, with able counsel employed on either side capable of then and there determining the actual questions of fact under consideration. It cannot be said that the testimony of the defendant and his witness concerning such facts as to the number of mares bred, and their age, etc., would not furnish certainly just as true and correct information to the plaintiff as to all of such facts as could possibly be furnished by the defendants to the plaintiff by such written statement, which was referred to in the specific warranty. The

defendants were present in court with their witnesses to prove all these facts by competent testimony under solemn oath, and the plaintiff would have every opportunity to inquire into the truthfulness of such statements, to procure the names, residences, and locations of the parties owning the mares, and any other information concerning the feeding and care of such stallion, and all the other facts set forth in such specific warranty. It was prejudicial error to exclude such testimony.

The majority opinion in effect holds that the furnishing of a list of mares prior to August 1, 1913, which list was claimed to be part of the warranty, was a precedent condition to the right of the defendants to recover on the breach of warranty. In other words, as we view it, the majority opinion in fact holds that parties contracting with reference to any subject-matter may also by the contract exercise control over the introduction of evidence in court in a subsequent action concerning the subject-matter, by making the furnishing of such evidence to one of the contracting parties a condition precedent to the right to maintain an action concerning the subject-matter of the contract, such as a breach of warranty. It is easily understood that the list of mares referred to is part of the evidence which would go to prove the breeding qualities of the stallion in question. It has no other purpose. It bears no other relation to the subject-matter of the action. The main question in the case, in fact, the only question is, Did the stallion in question comply as to breeding qualities with the warranty which was made concerning such breeding qualities? Any matter which would tend to prove or disprove whether the stallion was of the requisite breeding qualities as warranted would be merely evidence, and would not be part of the subject-matter of the contract. As we view it, it gives the parties the right, in contracting with reference to any subject-matter, to control and prevent the introduction in court of any evidence which is desired to be excluded concerning the subject-matter of the contract, or any of the qualities or conditions relating to such subject-matter, unless there is a full compliance with all precedent conditions concerning the service of the copy of the evidence, in the same manner and to the same effect as in this case. The list was tendered in the court, and Steinbach had the opportunity to examine it, and if he desired more time for a more thorough examination he could have applied to the trial court for an extension of time or a continuance of the case until such time as he

could have made fuller investigation of the list of mares so furnished, if he desired to do so. Eventually, then, after such examination, if Steinbach had desired to make it, the case could have been tried upon its merits, and the only merits or contention in the case is whether or not the stallion came up to the breeding standard as represented. This question now can never be determined. The merits of this action, that is, the breeding qualities of this stallion, can never be determined. Bauclair can never have any standing in court to prove that the stallion was not as warranted. The merits must remain always undetermined, and, as we have before said, the merits in this case, and the only real issue in the case, is the breeding qualities of the stallion.

Referring to defendants' assignments of error Nos. 9 and 10, it is prejudicial error against the defendants to refuse to receive exhibits 5 and 9. Exhibit 9 was a complete record of said stallion in servie between April 15 and July 15, 1913, the plaintiff could have had an opportunity to examine such record and acquired all the information concerning the matters therein stated at the time of the trial. Referring to defendants' assignment of error No. 41, wherein the court instructed the jury as follows: "Remember, you have not anything to do in this case with the matter of warranties, so far as the warranties are concerned, but you should only go back to talks leading up to this sale,—the talks between these two men, in order to determine whether or not Bauclair was led into the making of this contract through misrepresentation, through fraud and deceit, by Mr. Steinbach, as I have defined those matters to you." Such instructions constituted prejudicial error as to the defendant.

The defendant in his answer, by way of counterclaim, set up a claim for damages against the plaintiff in the sum of $1,200, which damages were claimed by defendant to have resulted from a breach of warranty concerning the breeding qualities of the stallion in question.

Paragraph 5 of defendants' answer contains the following allegations: "That the plaintiff sold said stallion to the defendants, knowing that defendants wanted him for breeding purposes, and knowing that defendants relied upon his warranty and representation as to the soundness and health of said stallion, and also as to the fitness of said stallion for breeding purposes, and knowing that said stallion was diseased and unfit for breeding purposes, as aforesaid."

Paragraph 4 of said answer contains the following allegation: "That at the time of said warranty and representations and sale said stallion was not sound and healthy, was not a good breeder and in good breeding condition as warranted and represented by plaintiff, but was suffering from a disease of the legs known as sidebones, and also from a disease of the throat knows as acute laryngitis; was not a good breeder and in good breeding condition, all of which facts were well known to the plaintiff at the time he sold and warranted said stallion as aforesaid.    That said warranty and representations were false and were made by the plaintiff with the intent to deceive the defendants and to induce them to purchase said stallion, and that the defendants were deceived and defrauded by the falsity of said warranty and representations."

Paragraph 6 contains the following allegations: "That as soon as the defendants discovered that said stallion was unsound and unfit for breeding purposes as hereinbefore stated, they offered to return him to the plaintiff, and demanded a return of said notes, but that said plaintiff refused to accept said stallion, and that said stallion died in October, 1913."

It appears, therefore, that the counterclaim in question was largely based upon the allegations in the answer concerning the falsity and breach of the warranty with reference to the breeding qualities of such horse, which breeding qualities had been warranted in the bill of sale. Leaving out all the allegations which refer to the soundness and health of the stallion, there yet remains in such allegations in paragraphs in such answer just mentioned a good cause of action in favor of the defendants against the plaintiff, which they have properly pleaded by way of counterclaim.    The matters which are set forth and alleged as the basis of such counterclaim are parts of and originated out of the same transaction, and therefore were properly pleaded as a counterclaim. It is a well-settled principle of law where there has been a breach of warranty, express or implied, the buyer may set off or counterclaim his damages sustained by reason of such breach, in an action for the price of goods.    35 Cyc. 441, and list of cases therein cited from almost every jurisdiction within the United States sustaining this principle of law. The court clearly committed prejudicial error in refusing to admit testimony tending to prove the allegations of the answer which were the

basis of the counterclaim. Questions concerning whether the stallion was properly fed, nourished, and cared for, the number of mares bred, their age and breeding condition, and the percentage which became in foal, were all important and material, and directly connected with and relative to the warranty contained in the bill of sale, which related to the breeding qualities of the stallion, and the exclusion of testimony bearing upon such questions was reversible, prejudicial error.

There is some testimony in the case relative to poisoned hay having caused the death of this stallion, together with several others of plaintiff's horses. It is immaterial from what cause the stallion died. The fact that the stallion did die makes no difference in the cause of action. The right of action is based upon a breach of warranty in the bill of sale, as well as other alleged rights of action. As to the warranties, the measure of damages is the difference between the value of the stallion as warranted and his value in the condition in which he was, and this could be shown whether the horse was living or dead.